ADVAMTEL, LLC et al., Plaintiffs
and Counterclaim–Defendants,

v.

AT & T CORP., Defendant and
Counterclaim–Plaintiff.

No. CIV. A. 00–643–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Oct. 27, 2000.

Douglas Paul Lobel, Kelley, Drye &
Warren, Washington, DC, for Plaintiffs.

Mary Catherine Zinsner, Mays & Valentine, McLean, VA, for Defendant.

### *MEMORANDUM OPINION*

ELLIS, District Judge.

Sixteen competitive local exchange carriers ("CLECs")[1] bring this severed action[2] against AT & T Corporation ("AT & T") to collect fees allegedly owed to them pursuant to a published tariff. AT & T contends it has no obligation to pay the fees because the tariff rate is unreasonable and because AT & T never ordered the ser-

---

1. Although the First Amended Complaint identifies eighty-nine plaintiffs, there are essentially only sixteen distinct plaintiffs and the remaining seventy-three are related operating subsidiaries of one or another of the sixteen distinct parent companies.

2. Originally, plaintiffs' claim included Sprint Communications Corporation ("Sprint") as a defendant. By Order dated June 23, 2000, the claims against AT & T and Sprint were severed. *See Advamtel, LLC v. AT & T Corp.,* C.A. No. 00–643–A, Order dated June 23, 2000.

vices or agreed to pay the tariff rates. As a result of a threshold motion, the parties' dispute concerning the reasonableness of the published tariff rates has been referred to the Federal Communications Commission ("FCC"). *See Advamtel, LLC v. AT & T Corp.*, 105 F.Supp.2d 507 (E.D.Va.2000). At issue now on the parties' cross-motions for summary judgment are (i) AT & T's defense that it never "ordered" service from the plaintiffs and therefore that it had no obligation to pay and (ii) plaintiffs' claim that if AT & T is not obligated to pay the tariff rates, plaintiffs are nonetheless entitled to recover from AT & T the value of the services on a quantum meruit basis.

## I

The instant dispute arises from plaintiffs' thus far unsuccessful effort to collect fees allegedly owed to them by AT & T pursuant to a published tariff for use of plaintiffs' local exchange networks in routing long distance telephone calls. Plaintiffs argue that AT & T, once it received plaintiffs' services, was obligated to pay the published tariff charges it owed, rather than employ the self-help measure of refusing to pay. According to plaintiffs, if AT & T considered plaintiffs' published tariff rates exorbitant, its sole remedy was to initiate a proceeding before the FCC challenging the reasonableness of plaintiffs' rates.[3] AT & T has filed a partial motion for summary judgment, arguing that plaintiffs have no claim because AT & T never ordered any of plaintiffs' services. As part of their response to this argument, plaintiffs seek to recover for the services rendered on a quantum meruit basis. Given the nature of the parties' contentions, a brief description of the relationship between CLECs, such as plaintiffs, and long-distance carriers, such as AT & T, is warranted.[4]

Local exchange carriers ("LECs") provide local telephone service to subscribers in the areas where they operate. The local telephone network begins with local "loops"—the cable strung on telephone poles or buried underground—that connect each telephone subscriber in a LEC's service area to local "central office" switches. These switches are, in turn, connected to each other through various transport facilities and serve to route calls along the network. LECs own and control most of the plant and facilities used to provide local telephone service in their geographic area.

There are two types of LECs, CLECs, such as plaintiffs, and established or incumbent LECs ("ILECs"). ILECs, such as Bell Atlantic, operated as monopolies in a given area until the local phone service market was opened by the Telecommunications Act of 1996, which provided for the emergence of new LECs, the CLECs, to compete with the so-called "Baby Bells."[5] *See* 47 U.S.C. § 251 *et seq.*

Local telephone networks are needed not only for making local calls, but also to originate and terminate long-distance calls. Typically, when an end user dials a long-distance number, the LEC serving that customer routes it to the customer's long-distance carrier. This service is referred to as "originating access." The long-distance carrier then routes the call to the local carrier serving the called customer, and that local carrier completes the call by routing it to the called customer. This service is referred to as "terminating ac-

**3.** The Telecommunications Act forbids telecommunications carriers from engaging in any "unjust" or "unreasonable" practice or from charging "unreasonable" rates. *See* 47 U.S.C. §§ 201(a), (b).

**4.** This recitation of facts is largely derived from *Advamtel, LLC v. AT & T Corp.*, 105 F.Supp.2d 507 (E.D.Va.2000).

**5.** After the break-up of AT & T in 1982, the Bell operating companies were granted monopolies in the local phone service market. *See AT & T Communications of Va., Inc. v. Bell Atlantic–Va.*, 35 F.Supp.2d 493, 494 (E.D.Va.1999).

cess." Thus, long-distance calls generally cannot be completed without originating and terminating access from an LEC. Thus, AT & T and other long-distance carriers must order access services from the LEC, whether a CLEC or an ILEC, that serves the end user. These LECs then impose access charges on the long-distance carriers in exchange for access to the local network to originate and terminate long-distance calls. Because the ILECs' wires are usually the only connection between a household or business and the rest of the local network, and because duplicating those wires would be prohibitively expensive, the CLECs generally interconnect with the ILECs' local network in providing local service, and the long-distance carriers' networks generally connect to the ILEC's network, not the CLEC's network. Thus, when an end user who subscribes to a CLEC's local service places a long-distance call, the CLEC directs the call to the long-distance carrier's network via the ILEC's facilities and equipment. The CLECs impose access charges on long-distance carriers for calls that travel over the ILECs' network, but only after the fact. Thus, when a long-distance carrier receives calls from an ILEC's network, it does not know, at that time, the identity of the CLEC or ILEC that directed the call to the long-distance carrier.

Pursuant to FCC requirements, telecommunications carriers, such as plaintiffs, file tariffs which, upon FCC approval, govern their rate structure. *See* 47 U.S.C. § 153(h); *MCI Telecomm. Corp. v. Dominican Communication Corp.*, 984 F.Supp. 185, 187 (S.D.N.Y.1997). Tariffs have been defined as "essentially offers to sell on specified terms, filed with the FCC and subject to modification or disapproval by it." *Cahnmann v. Sprint Corp.*, 133 F.3d 484, 487 (7th Cir.1998). As tariffs are filed with the FCC, they are available for public view. *See MCI Telecomm.*

*Corp. v. Dominican*, 765 F.2d 1186, 1189 (D.C.Cir.1985). Plaintiffs filed tariffs with the FCC, and these tariffs governed their dealings with other common carriers, such as Sprint and AT & T. *See Cincinnati Bell Tel. Co. v. Allnet Communication Serv. Inc.*, 17 F.3d 921, 924 n. 4 (6th Cir.1994).

AT & T began receiving originating and terminating access service from plaintiffs in April 1997. Since that time, plaintiffs have submitted invoices to AT & T, containing information reflecting the access services utilized by AT & T and the applicable tariffs. While initially paying these charges in full, since November 1998, AT & T has refused to pay the tariff rates for these access services, claiming that it is not obligated to pay the plaintiffs' tariff rates because they are "unreasonable" and in violation of 47 U.S.C. § 201(a), (b).

In April, plaintiffs filed a two-count complaint against Sprint and AT & T. Count I seeks to collect access charges at the published tariff rate for originating and terminating long-distance calls, and Count II states a claim for violations of the Telecommunications Act, 47 U.S.C. § 201, for unjust and unreasonable practices by a common carrier. In August, plaintiffs were granted leave to amend their complaint to add two additional counts. *See Advamtel, LLC, v. AT & T Corp.*, 105 F.Supp.2d 507, Order dated August 18, 2000. Count III added an implied-in-fact contract claim. Count IV seeks recovery based on the formation of a quasi-contract. In June, AT & T filed a counterclaim asserting six claims against plaintiffs for: (i) engaging in unreasonable practices, in violation of § 201 of the Communications Act, (ii) imposing charges different from the charges specified in the applicable tariffs, in violation of § 203 of the Communications Act, (iii) charging unreasonable rates, in violation of § 201 of the Communications Act, (iv) using illegal cross-subsidies, in violation of § 254(k) of the Communications Act,[6] (v) engaging in

6. Section 254(k) provides that a "telecommunications carrier may not use services that are

not competitive to subsidize services that are subject to competition."

intentional and prospective interference with contract in violation of state common law, and (vi) a declaratory judgment, under 28 U.S.C. § 2201, that AT & T has the right to refuse to order plaintiffs' access services.

Threshold dismissal motions filed by both AT & T and Sprint resulted in the referral of Counts III and IV of AT & T's counterclaim, which relate to the reasonableness of the tariff rates, to the FCC on primary jurisdiction grounds. No stay of the proceedings was imposed pending a ruling from the FCC. *See Advamtel, LLC, et al. v. AT & T Corp., et al.,* 105 F.Supp.2d 507, Order dated July 21, 2000. Finally, plaintiffs' claims against AT & T and Sprint were severed. *See Advamtel, LLC, et al. v. AT & T Corp., et al.,* Civ. A. No. 00–643–A, Order dated June 23, 2000.

At issue now are the parties' cross-motions for summary judgment.

## II.

On a motion for summary judgment, the moving party must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The facts themselves, and the inferences to be drawn from those facts, must be viewed in the light most favorable to the nonmoving party. *See Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985). Summary judgment is appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The opposing party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, "the mere existence of some alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, in a case in which the nonmoving party bears the burden of proof at trial, as in this case, "Rule 56(e) requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56).

## III.

■ Analysis properly begins with a statement of the elements of plaintiffs' principal claim for the collection of charges for telecommunications services provided pursuant to filed tariffs. To collect charges pursuant to a tariff, plaintiffs must demonstrate (1) that they operated under a federally filed tariff and (2) that they provided services to the customer pursuant to that tariff. *See Frontier Communications of Mt. Pulaski, Inc. v. AT & T Corp.,* 957 F.Supp. 170, 175–76 (C.D.Ill. 1997). The parties do not dispute that all plaintiffs have filed valid tariffs with the FCC. The parties sharply dispute, however, whether plaintiffs provided services pursuant to those tariffs. Plaintiffs contend they are entitled to summary judgment because there is no dispute that plaintiffs provided the services in issue and that these services were covered by a filed tariff. AT & T claims it is entitled to summary judgment because the record shows it did not order the services in issue and indeed took positive steps to advise plaintiffs that their services were not wanted.

■ Resolution of these cross motions for summary judgment turns on a proper understanding of the filed-tariff or rate doctrine ("filed-rate" doctrine). *See Arkansas La. Gas Co. v. Hall,* 453 U.S. 571,

101 S.Ct. 2925, 69 L.Ed.2d 856 (1981). This doctrine stems from Section 203(c) of the Telecommunications Act, which provides, in pertinent part, that

> no carrier shall charge, demand, collect, or receive a greater or less or different compensation for such communication, or for any service in connection therewith, between the points named in any [tariff] than the charges specified in the [tariff] then in effect ... or [shall] extend to any person any privileges or facilities in such communication ... affecting such charges, except as specified in such [tariff].

Thus, under the Act, once a tariff is filed with the FCC, the filed-rate doctrine "forbids a regulated entity [from charging] rates for its services other than those properly filed with the appropriate federal regulatory authority." *Arkansas La. Gas Co.*, 453 U.S. at 577, 101 S.Ct. 2925. In other words, the rate indicated in a duly filed tariff is the only lawful charge for the covered services. *See AT & T v. Central Office Tel.*, 524 U.S. 214, 222, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998).[7] The filed-rate doctrine's underlying rationale is clear: it operates to prevent a carrier from charging unreasonable and discriminatory charges.[8] While the application of this doctrine can, at times, be both "strict" and "harsh," the obligation to charge only the rates in the filed tariff is essential to preventing unjust discrimination.[9]

■ The filed-rate doctrine, applied here, would require that AT & T pay the filed tariff rates for any covered services received from plaintiffs. Seeking to avoid this result, AT & T relies chiefly on the argument that it is not obligated to pay because it never ordered any services pursuant to the terms specified in the tariff. AT & T points out that plaintiffs' filed tariffs establish the procedure by which one can 'order' services, and AT & T asserts that it never invoked this procedure. More specifically, common to each of the tariffs is that customers are required to order services through the submission of some form of a written order.[10] Because it is undisputed that most of the plaintiffs did not receive written requests from AT & T for any services,[11] AT & T argues that it

---

7. The Supreme Court has affirmatively extended the filed-rate doctrine to the Telecommunications Act. *See Central Office Tel.*, 524 U.S. at 222, 118 S.Ct. 1956.

8. *See Central Office Tel.*, 524 U.S. at 222, 118 S.Ct. 1956; *Maislin Indus., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990); *US Wats, Inc. v. American Tel. and Telegraph Co.*, 1994 WL 116009 at *3 (E.D.Pa. April 5, 1994). AT & T incorrectly asserts that the *Central Office Telephone* decision overruled *US Wats*. First, *Central Office Telephone* made no mention of the *US Wats* decision. Second and more significantly, *Central Office Telephone* reaffirmed the prominence of the anti-discrimination principle in the filed-rate doctrine. *See Central Office Tel.*, 524 U.S. at 226, 118 S.Ct. 1956 (holding that "[b]ecause respondent asks for *privileges* not included in the tariff, its state-law claims are barred").

9. *See Central Office Tel.*, 524 U.S. at 222, 118 S.Ct. 1956; *Maislin*, 497 U.S. at 130, 110 S.Ct. 2759 ("[T]he filed-rate doctrine forbids as discriminatory the secret negotiation and collection of rates lower than the filed rate.");

*Western Transp. Co. v. Wilson & Co.*, 682 F.2d 1227, 1231 (7th Cir.1982) ("Congress did not create a flexible standard for the courts to apply in accordance with the facts, equities, and economic realities of the particular case. It forbade carriers to receive any different compensation from the rate in the applicable tariff.").

10. Plaintiffs' tariffs may be grouped into three categories. One category consists of tariffs that require the submission of an Access Service Request ("ASR"). A second category requires that customers "submit detailed written orders for service and supply a copy of such orders to each of the LECs participating in the provision of service." NECA Tariff No. 2. The final category contains no ordering provision. However, this category of tariffs does define "customer" as "one who subscribes to services" and adopts the MECOD guidelines that require submission of a highly detailed ASR to initiate services.

11. There are factual disputes as to whether AT & T submitted written requests or ASRs to three of the plaintiffs: CTSI, Consolidated, and Focal. These disputes present triable is-

has no obligation to pay for the services. The question presented, therefore, is whether the filed-rate doctrine—that is, the obligation to pay the tariff rates—applies where, as here, the tariff's ordering procedures were not followed. Put differently, the question is whether the tariff rates apply even where the services are not ordered in the manner prescribed by the tariff.

An affirmative answer to this question is found in *United Artists Payphone Corp. v. New York Tel. Co.*, and its progeny.[12] In *United Artists*, the FCC looked beyond the definition of "ordering" found in the carrier's tariff to determine whether United Artists was AT & T's customer, and therefore, whether it was required to pay the tariff rate. *See United Artists Payphone Corp. v. New York Tel. Co.*, 8 FCC Rcd 5563 at ¶ 13 (1993). Ultimately, the FCC concluded that if United Artists "failed to take steps to control unauthorized [charges, it] could reasonably be held to have *constructively ordered* services from [the carrier]." *Id.* (emphasis added). Thus was born the constructive ordering doctrine under which a party "orders" a carrier's services when the receiver of services (1) is interconnected in such a manner that it can expect to receive access services; (2) fails to take reasonable steps to prevent the receipt of access services; and (3) does in fact receive such services. *See In re Access Charge Reform*, 14 FCC Rcd 14221 (1999) at ¶ 188.

AT & T argues that the constructive ordering doctrine plaintiffs advocate violates the filed-rate doctrine because it im-permissibly permits parties to waive clear ordering provisions in the tariff, in violation of *Davis v. Henderson*, 266 U.S. 92, 45 S.Ct. 24, 69 L.Ed. 182 (1924). Instead, AT & T argues that the constructive ordering doctrine is properly applied only in cases where the ordering provisions in the tariff are ambiguous. This argument is unpersuasive. While the FCC in *United Artists* applied the constructive ordering doctrine in the context of an ambiguous ordering provision, the doctrine has not been limited to this context. *See, e.g., AT & T v. City of New York*, 83 F.3d 549 (2d Cir. 1996); *AT & T Corp. v. Community Health Group*, 931 F.Supp. 719 (S.D.Cal. 1995); *In re Access Charge Reform*, 14 FCC Rcd 14221 (1999). In these cases, the courts and the FCC have applied the constructive ordering doctrine in situations where it was clear that the tariff's ordering provisions had not been followed. For example, in *Community Health Group*, the defendant was required to pay the tariff rate even though the charges were caused by a computer hacker who had illegally gained access to its phone system. *See Community Health Group*, 931 F.Supp. at 722 (citing *United Artists* as precedent).[13] Despite these cases, AT & T argues that the filed-rate doctrine precludes the parties from waiving the terms specified in the tariff, citing *Davis v. Henderson*, 266 U.S. 92, 45 S.Ct. 24, 69 L.Ed. 182 (1924), in support. While *Davis* held that the provisions there at issue could not be waived, two important considerations limit the effect of this 1924 decision. First, the Supreme Court has subsequently limited *Davis* by making clear that the filed-rate

sues of fact. If it is determined at trial that AT & T did submit ASRs to these three plaintiffs and that AT & T did not take effective steps to terminate service, then the filed-rate doctrine would require AT & T to pay the tariff rate for these ordered services. If the trial discloses that the services were not formally ordered, then the discussion herein concerning constructive ordering of services is applicable.

**12.** *See United Artists Payphone Corp. v. New York Tel. Co.*, 8 FCC Rcd 5563 (1993); *see*

also *AT & T v. City of New York*, 83 F.3d 549 (2d Cir.1996); *AT & T Corp. v. Community Health Group*, 931 F.Supp. 719 (S.D.Cal. 1995); *In re Access Charge Reform*, 14 FCC Rcd 14221 (1999).

**13.** *See also City of New York*, 83 F.3d at 553 (relying on *United Artists* to hold that a party can become a " 'customer,' in one of two ways: (1) by affirmatively ordering the service ... or (2) by constructively ordering [service] and creating an 'inadvertent carrier-customer relationship ....' ").

doctrine applies only where the policy of nondiscrimination in rates is implicated. *See Central Office Tel.*, 524 U.S. at 222–23, 118 S.Ct. 1956; *see also Maislin*, 497 U.S. at 126–27, 110 S.Ct. 2759. In other words, deviations from the filed tariff that do not result in rate discrimination are not barred by the filed-rate doctrine.[14] Second, the facts of this case are significantly distinguishable from *Davis*, which involved an attempt by a shipper, who had not complied with a tariff's ordering provisions, to force a carrier to provide services pursuant to the tariff. *See Davis*, 266 U.S. at 93, 45 S.Ct. 24. By contrast, plaintiffs here, in effect the carriers in this context, are suing to recover the tariff rates for the services already provided. The constructive ordering doctrine, as applied here, is not so much about *ordering* but about ensuring equal payment of the tariff rate when one receives services pursuant to a filed tariff.[15] While the Supreme Court in *Davis* did indicate that the shipper could

not demand waiver of tariff provisions, it did not hold that a carrier, with a validly filed tariff, could not recover the tariff rate after the shipper had obtained the benefit of its services. Accordingly, the constructive ordering doctrine, rather than conflicting with the filed-rate doctrine, is fully consistent with it and its underlying policy. This is so, because the ordering provisions in the tariffs at issue do not affect the rate to be charged by the plaintiffs, and hence adherence or non-adherence to these provisions does not implicate the filed-rate doctrine's anti-discrimination policy.[16] While the filed-rate doctrine precludes deviations from the tariff that affect the rate charged by the carrier,[17] it does not prevent deviations when they do not affect the charged rate.[18] While the Supreme Court has recognized that deviations from the services or requirements outlined in the tariff can implicate the anti-discrimination principle of the filed-rate doctrine,[19] the

**14.** *See US Wats, Inc. v. AT & T Co.*, 1994 WL 116009, at *5 (holding that filed-rate doctrine does not apply when adjudication of the plaintiffs' claim "will not result in rate discrimination nor embroil the court in a dispute over reasonableness of charges").

**15.** While not directly stating so, AT & T implicitly accepts this argument. AT & T argued in its motion for summary judgment that it was entitled to bill customers for calls routed against AT & T's wishes because once those calls were placed, AT & T was "legally obligated under Section 203(c) of the Telecommunications Act to charge its full tariffed rate for all services ordered by and provided to the end-user customer by AT & T." This is precisely the same argument that plaintiffs are making. Because AT & T received the benefit of plaintiffs' services, plaintiffs are required under the Telecommunications Act to charge the rate specified in their tariff.

**16.** In fact, plaintiffs seek to charge the tariff rate.

**17.** *See Imports, Etc., Ltd., v. ABF Freight Sys., Inc.*, 162 F.3d 528, 530–31 (8th Cir.1998); *US Wats v. AT & T*, 1994 WL 116009, at *5 (rejecting the proposition that "no contract can exist other than the tariff" and holding that "filed tariff doctrine [forecloses one] from claiming that a contract existed which

obligated defendant ... to charge rates inconsistent with its validly filed tariff").

**18.** AT & T's argument that the filed-rate doctrine applies even when the rate is not implicated is not supported by the cases it cites; rather, in each of those cases, the doctrine's anti-discrimination policy was implicated because the tariff provisions there in issue, unlike the ordering provisions here, actually affected rates. For example, in *Western Transp. Co. v. Wilson & Co.*, 682 F.2d 1227 (7th Cir. 1982), the court noted that by failing to comply with the tariff requirement of specifying the manner of shipment, the shipper "received an off-tariff discount." *Id.* at 1231. The anti-discrimination principle was also the basis for the holding in *Atchison, Topeka and Sante Fe Ry. v. Bouziden*, 307 F.2d 230 (10th Cir.1962). In that case, customers attempted to make an oral request to divert their shipment on to trucks to avoid a higher rate tariff that would apply if they continued their shipment by rail. The tariff, however, required that the diversion request be in writing. Thus, by failing to adhere to the requirements of the tariff, the parties attempted to get a better rate for the services they received. *See id.* at 231 ("To hold otherwise would open wide the door to unlawful discrimination.").

**19.** For example, the Supreme Court recognized that "[r]ates do not exist in isolation."

same cannot be said of the tariff's ordering provisions here in issue; non-adherence to the ordering provisions results in no difference or preferential treatment in rates. It follows that the application of the constructive ordering doctrine in this context is wholly compatible and consistent with the filed-rate doctrine. Indeed, only if the constructive ordering doctrine is applied here can massive rate discrimination be avoided. Application of the constructive ordering doctrine here ensures that all who received services from plaintiffs will be charged the same rate; if the doctrine is not applied, AT & T will have received millions of dollars of services for free— surely, a result antithetical to the filed-rate doctrine.

Given the applicability of the constructive ordering doctrine in this matter, summary judgment is inappropriate, because a genuine issue of material fact remains as to whether AT & T constructively ordered service from the plaintiffs. As previously stated, the constructive ordering doctrine holds that a party "orders" a carrier's services when the receiver of services (1) is interconnected in such a manner that it can expect to receive access services; (2)` fails to take reasonable steps to prevent the receipt of access services; and (3) does in fact receive such services. *See In re Access Charge Reform*, 14 FCC Rcd 14221 (1999) at ¶ 188. As indicated in *United Artists* and *City of New York*, in order to find that a service has been constructively ordered, the carrier must show "affirmative action ... to establish a [customer] relationship." *City of New York*, 83 F.3d

at 553–54. This affirmative action could be the result of the failure "to take reasonable steps" to avoid receiving the carrier's services. *Id.*[20] The inquiry thus requires a determination of whether the facts, taken together, are sufficient to establish a constructive order.

The parties sharply dispute the facts in this case and, therefore, whether AT & T constructively ordered plaintiffs' service. First, as already discussed, the parties dispute whether AT & T issued ASRs to at least three of the plaintiffs. Second, a factual dispute exists as to whether AT & T has taken reasonable steps to avoid the receipt of plaintiffs' services. AT & T argues that it repeatedly communicated to plaintiffs (1) that AT & T had not ordered their services; (2) that plaintiffs should not route traffic to AT & T's network; and (3) that plaintiffs should cease and desist from subscribing their customers to AT & T's services. Furthermore, AT & T argues that plaintiffs took a series of affirmative steps to route traffic to AT & T without AT & T's authorization and that AT & T was without the authority to block traffic to and from plaintiffs' network. Plaintiffs, on the other hand, argue that the steps taken by AT & T were insufficient to block receipt of plaintiffs' services; instead, AT & T allegedly sought to avoid inconveniencing its clients by effectively terminating its relationship with plaintiffs. Simply refusing to pay the tariff rate while continuing to permit calls to be routed through AT & T's service is insufficient to prevent access. *See MGC Communications v. AT & T Corp.*, FCC Rcd (1999).[21] Because

---

See *Central Office Tel.*, 524 U.S. at 223, 118 S.Ct. 1956. Thus, the court has recognized that factors such as the speed in which applications are processed or adherence to notice provisions can have a discriminatory impact on the charged rate. *See id.; Atchison*, 307 F.2d at 230.

**20.** *See also Community Health Group*, 931 F.Supp. at 723 ("[Defendants] have come forth with no showing that they acted in any way to control the unauthorized charging of AT & T's [service] to their system"); *MCI Telecomms. Corp. v. Ameri–Tel, Inc.*, 852

F.Supp. 659, 668 (N.D.Ill.1994) (examining the steps taken to "prevent unauthorized usage" of services).

**21.** In *MGC*, the FCC found that sending a single notification letter rejecting service was not enough to affirmatively reject service. The FCC focused on AT & T's failure (1) to initiate contact with customers to inform them that AT & T would no longer provide interexchange service and (2) to prevent customers from designating AT & T as their presubscribed interexchange carrier. The FCC concluded by determining that AT & T's

the facts are in such sharp dispute, summary judgment is inappropriate on this issue central to plaintiffs' collection claim in Counts I and II of their complaint.

## IV.

■ As an alternative theory to recovery, plaintiffs argue that they are entitled to recovery based on quantum meruit. This quasi-contract theory is unpersuasive; it misconceives the scope of the filed-rate doctrine. Once a tariff has been validly filed with the FCC, the parties are precluded from negotiating any separate agreements that affect the rate for which services are charged. Because a determination that the parties entered into a quasi-contract could result in the recovery of a rate other than that specified in the tariff, plaintiffs' quasi-contract claim must fail under the filed-rate doctrine.[22] To be

sure, 47 U.S.C. § 211 permits some private contracting between carriers,[23] but it does not abrogate the filed-rate doctrine or the requirements of Section 203(c), which prohibit carriers from altering, by contract, rates which they announce in their filed tariffs. Thus, Section 211 recognizes that separate agreements between carriers are permitted, but only under circumstances that do not affect the rate filed under the tariff. *See American Broadcasting Co., Inc. v. FCC,* 643 F.2d 818 (C.A.D.C.1980).[24] In sum, because the services in issue were covered by a filed tariff, it is not open to plaintiffs to claim that they are entitled to recover for the services on some quantum meruit basis that may differ from the tariff rate. Because the services in issue were covered by a filed tariff, the parties were precluded from entering into separate contractual arrangements to modify the tariff rates.[25]

---

actions were "not consistent with its claimed intention to terminate MGC's ... service," holding that AT & T chose not to address these concerns because it did not wish to inconvenience its own customers. *See id.* at ¶¶ 8–9. AT & T contends *MGC* applies only where it is first established that the services were ordered. The relevance of *MGC*, however, must await the development of the factual record at trial.

22. *See, e.g., MCI Telecomm. Corp. v. Dominican Comm. Corp.,* 984 F.Supp. 185, 191 (S.D.N.Y.1997) (holding that filed tariffs are presumed valid until the FCC determines otherwise and that carriers are unable to charge or receive any rate not specified in the tariff).

23. Section 211 provides that "every carrier subject to this chapter shall file with the Commission copies of all contracts, agreements, or arrangements with other carriers, or with common carriers not subject to the provisions of this chapter, in relation to any traffic affected by the provisions of this chapter to which it may be a party." 47 U.S.C. § 211.

24. Plaintiffs' reliance on FCC discussions of permissive detariffing as permitting off-tariff contracts fails for the same reasons. Permissive detariffing permits carriers to file tariffs and thus be bound by the rate established therein or, alternatively, to negotiate separate agreements *in lieu of,* or rather than, filing tariffs. *See Hyperion, Hyperion Telecomms., Inc.,* 12 FCC Rcd 8596, at ¶ 27 (1997); 47 U.S.C. § 211(a); *see also Second Order on*

*Reconsideration and Erratum, Policy and Rules Concerning the Interstate, Interexchange Marketplace,* 14 FCC Rcd 6004 at ¶ 2 (1999) (stating that one of the reasons to move toward a complete or permissive detariffing regime is to avoid the "potentially harsh consequences of the filed-rate doctrine").

25. *See Central Office Tel.,* 524 U.S. at 226, 118 S.Ct. 1956 (holding that a filed tariff bars a breach of contract claim "for privileges not included in the tariff"); *Fax Telecommunicaciones Inc. v. AT & T,* 138 F.3d 479, 489–90 (2d Cir.1998) (holding that judicial enforcement of a promise or contract to provide service on terms not contained in filed tariff is precluded by the filed-rate doctrine). In the companion case to this matter, *Advamtel, LLC et al. v. Sprint Communications,* Co., C.A. No. 00–1074–A, Sprint, in asserting its own implied contract claim, relies on *Bell Tel. Co. of Pa. v. FCC,* 503 F.2d 1250 (3d Cir.1974). Just as plaintiffs' quasi-contract claim is unsuccessful, so is Sprint's. In *Bell Tel.,* the court held that the Telecommunications Act did not authorize modification or abrogation of an *existing* privately negotiated agreement by a *subsequently* filed tariff. *See id.* at 1281–82. This case is the exact opposite of *Bell.* Here, it is argued that a *subsequent* agreement or implied contract can modify an *existing* tariff. No support exists for this proposition; its application violates the very principles of the filed-rate doctrine—avoiding discrimination in charging.

Thus, AT & T's motion for summary judgment is granted as to plaintiffs' quasi-contract claim, Count IV of plaintiffs' complaint.[26] There is no dispute that each of the plaintiffs have a validly-filed tariff with the FCC. Accordingly, the parties were without authority to negotiate any separate arrangements, including implied contracts, that would have provided services at any rate other than that indicated in the tariff. If plaintiffs were successful on this claim, they would receive a rate different from that specified in the tariff—a result the filed-rate doctrine seeks to avoid.

## V

Given the applicability of the constructive ordering doctrine to this matter, summary judgment is inappropriate as to any of the remaining claims, as there are triable issues of fact to be resolved at trial. Thus, the remaining claims include plaintiffs' Count I (collection of tariff rate) and Count II (violation of the Telecommunications Act) and AT & T's counterclaims, including Count I (engaging in unreasonable practices in violation of the Telecommunications Act), Count II (imposing charges different the charges specified in the tariff), Count V (engaging in intentional and prospective interference with contract in violation of state common law), and Count VI (seeking a declaratory judgment that AT & T has the right to refuse to order plaintiffs' access services). And, among the triable issues of fact raised by these claims are: (1) whether AT & T complied with the tariff ordering provisions as to any plaintiffs; (2) whether AT & T and the plaintiffs were interconnected in such a manner that AT & T could reasonably have expected to receive plaintiffs' access services; (3) what steps were taken or could have been taken by AT & T to block, refuse, or terminate receipt of plaintiffs' services and whether these steps were sufficient to negate the operation of the constructive ordering doctrine; and (4) if liability is found, the specific amount of damages owed to the plaintiffs.

An appropriate order has been issued.

The Clerk is directed to send a copy of this Order to all counsel of record.

---

26. Plaintiffs, in Count III of the complaint, also assert an implied-in-fact contract as an alternative theory of recovery. Because plaintiffs seek to recover the tariff rate under this theory, the filed-rate doctrine does not bar such a contract. However, because the requirements for formation of an implied-in-fact contract are essentially indistinguishable from the requirements to satisfy the constructive ordering doctrine, Count III is effectively subsumed in the disposition of Counts I and II. Accordingly, Count III is dismissed.