**AT&T COMMUNICATIONS OF THE MIDWEST, INC., Appellant,**

**v.**

**IOWA UTILITIES BOARD, Appellee,**

**Coon Rapids Municipal Communications Utility; Laurens Municipal Broadband Communications Utility; FiberComm, L.C.; Forest City Telecom, Inc.; Heart of Iowa Communications, Inc.; Independent Networks,**

L.C.; Lost Nation–Elwood Telephone Company; Office of Consumer Advocate, a Division of The Iowa Department of Justice; Goldfield Access Network, L.C.; and Iowa Association of Municipal Utilities, Intervenors–Appellees.

No. 03–0648.

Supreme Court of Iowa.

Sept. 15, 2004.

James F. Bendernagel and David M. Miles of Sidley Austin Brown & Wood L.L.P., Washington, D.C., and Richard W. Lozier, Jr. of Belin Lamson McCormick Zumbach Flynn, A P.C., Des Moines, for appellant.

David J. Lynch, Des Moines, for appellee Iowa Utilities Board.

Ivan T. Webber of Ahlers & Cooney, P.C., Des Moines, for intervenors-appellees Coon Rapids Municipal Communications Utility and Laurens Municipal Broadband Communications Utility.

Robert F. Holz, Jr. and Diane M. Stahle of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for intervenors-appellees FiberComm, L.C.; Forest City Telecom, Inc.; Heart of Iowa Communications, Inc.; Independent Networks, L.C.; and Lost Nation–Elwood Telephone Company.

Dennis L. Puckett of Sullivan & Ward, P.C., Des Moines, for intervenor-appellee Goldfield Access Network, L.C.

Michael R. May, Ankeny, for intervenor-appellee Iowa Association of Municipal Utilities.

Jennifer Easler, Assistant Attorney General, Des Moines, for intervenor-appellee Office of Consumer Advocate.

PER CURIAM.

The district court, sitting in review of agency action, affirmed in part and reversed in part a decision of the Iowa Utilities Board (IUB) in this dispute among providers of telephone service. We agree with the district court that the IUB correctly held AT&T constructively ordered services from the "competitive local exchange carriers" (CLECs) and must pay the tariffed rates for past services. Although we disagree with the district court's ruling that the IUB could not establish a new rate in this proceeding, we agree that the IUB did not have authority to waive its own rule requiring all tariffs to include the "CCL charge." Accordingly, we affirm the district court's decision reversing the agency's ruling setting a new rate. We remand the case to the district court for the entry of an order remanding the case to the IUB to determine a prospective rate consistent with this opinion.

■ This appeal is governed by the standards set forth in Iowa Code section 17A.19 (2001) of the Iowa Administrative Procedure Act (IAPA). *Locate.Plus.Com, Inc. v. Iowa Dep't of Transp.*, 650 N.W.2d 609, 612 (Iowa 2002). If the agency's action meets one of the specified provisions contained in Iowa Code section 17A.19(10), we "shall reverse, modify, or grant other appropriate relief" if we conclude a per-

son's substantial rights have been prejudiced because of the agency action. Iowa Code § 17A.19(10). Further, we must determine whether our application of the standards set forth in section 17A.19(1) generate the same result as reached by the district court. *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 589 (Iowa 2004).

This dispute arose over charges for telephone services. The appellees are all non-rate-regulated local exchange carriers certified by the IUB. They are known as CLECs because they operate in communities where there was already a local exchange carrier. Incumbent local exchange carriers (ILECs) were once the sole providers, but now the CLECs also provide local exchange services to Iowa communities.[1] Both ILECs and CLECs are local exchange carriers (LEC). Interexchange carriers (IXC) provide customers with long-distance service.

CLECs face intense competition from other carriers when pricing services to the end users. But there are no competitive restraints on the prices that CLECs charge the IXCs, so that each CLEC has "a series of bottleneck monopolies over access to each individual end user." *Access Charge Reform Order*, 16 F.C.C.R. 9923 ¶ 30 (April 27, 2001). AT&T contends that the CLECs thereby extorted much higher prices than the ILECs.[2] The CLECs counter that their rate tariffs have been duly approved by the IUB and are in accord with Iowa law. Moreover, the

---

1. In Iowa the main providers were GTE (now Iowa Telecom) and U.S. West (now Qwest). This situation changed when Congress passed the Telecommunications Act of 1996 and Iowa passed similar legislation in 1995. Iowa Code § 476.101 (1997); *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, 11 F.C.C.R. 15,499 ¶¶ 1, 8–9 (August 8, 1996); First Re-

port and Order, *Access Charge Reform Order*, 12 F.C.C.R. 15982 ¶¶ 1, 9, 263 (May 16, 1997).

2. For example, FiberComm charged 8.5 cents per minute access—five times more than Qwest, the competing ILEC. Likewise, Goldfield and Laurens both charged 8.5 cents per minute—again five times higher than Iowa Telecom, the competing ILEC.

CLECs emphasize that AT&T never objected to these tariffs.[3]

AT&T is an IXC providing long-distance services throughout Iowa. For AT&T to connect long-distance calls, it must purchase both originating and terminating access service from the callers' local exchange carrier. This is because AT&T's network does not extend all the way to the premises of the end users.

Nearly all of the nonrate-regulated local exchange carriers connect to interexchange carriers through the centralized equal access services of Iowa Network Services (INS). INS is a fiber-optic network and switching system designed to concentrate the long-distance traffic to and from the numerous independent Iowa telephone companies. INS connects local exchange carriers with IXCs. So, instead of dozens of local exchange carriers administering access with IXCs, INS coordinates those functions for its members.

INS entered an agreement with AT&T to provide centralized equal access with each participating phone company in February 1989.[4] This agreement authorized INS to connect AT&T with new access service companies as they were added. Accordingly, INS has since connected AT&T to the new companies and traffic. AT&T has never attempted to modify this arrangement.

The ILECs charge less than the CLECs, and this dispute arises because AT&T refused to pay the CLECs' higher rates. AT&T adopted a policy not to order services from the CLECs whose rates are higher than the ILECs.[5] AT&T announced its policy and notified the CLECs. Though the CLECs knew about AT&T's new policy, they continued to provide "unordered" service and billed AT&T accordingly. Most of the CLECs had provided originating and terminating access to AT&T for several years. But then AT&T stopped paying the CLECs in mid–1999.

The CLECs filed this complaint with the IUB under Iowa Code section 476.11 (authorizing IUB to determine terms and procedures for toll connections between two or more telephone companies). The IUB determined AT&T was in violation of Iowa Code sections 476.101(9) (prohibiting any action that disadvantages anyone who has chosen to receive services of another company), and 477.11 (requiring long-distance companies to furnish equal facilities to any local exchange and make the necessary connections) for refusing to accept and pay for the disputed access services. The IUB also held that AT&T had constructively ordered the access services. The IUB explained that it had authority under Iowa Code sections 476.3(1) and 476.11 to deter-

---

3. Iowa Administrative Code rule 199—22.14(4) requires that LECs give IXCs notice of their access tariffs. Under rule 199—22.14(5), IXCs may file a resistance with the IUB respecting any changes to access tariffs.

4. The CLECs note that, while at first AT&T only participated in the interLATA (Local Access and Transport Area) market, on February 10, 1995, AT&T expanded its participation through INS to also include intraLATA. AT&T thereby recognized that INS coordinates centralized equal access processes for participating carriers.

5. AT&T has never paid for the access services since implementing this policy. In addition,

AT&T implemented various internal controls, such as creating a "scrub list" to remove the CLECs' customers from AT&T's outbound telemarketing and mass mailing lists. AT&T also explored the possibility of reconfiguring the network to block calls originating from or terminating on the CLECs' local switches. Apparently, however, that option was impractical because the CLECs' traffic is managed by the INS's tandem switch, which commingles LECs access service. Finally, AT&T attempted to negotiate competitive access rates with the CLECs; this worked with some CLECs but not with others.

mine the lawfulness of the tariff rates and provide prospective remedial rate reduction, and it held the CLECs' tariffs were unlawful and a deliberate abuse of their monopoly over access services.

The IUB also found that the CLECs' access charges were not just, reasonable, and nondiscriminatory as required by Iowa Code section 476.3. The IUB ordered the CLECs to file new rates and to strike the three-cent-per-minute common carrier line (CCL) charge. But these new tariffs were only prospective; as for past services, AT&T was ordered to pay at the tariffed rates in effect when the services were rendered.

**I.** The district court held the IUB exceeded its statutory authority and violated due process when it examined the reasonableness of the CLECs' access rates, and it lacked authority to waive the CCL charge because the IUB's rule, Iowa Administrative Code rule 199—1.3, is *ultra vires*. The court based its holding on finding a violation of due process. Due process prescribes that all administrative hearings under Iowa Code section 17A.12 include a notice of a contested case, which provides the following:

> b. A statement of the legal authority and jurisdiction under which the hearing is to be held.
>
> c. A reference to the particular sections of the statutes and rules involved.
>
> d. A short and plain statement of the matters asserted.

The court acknowledged that Iowa Code section 476.11, invoked by the CLECs in this proceeding, grants the IUB broad authority to determine the reasonableness of the rates. The court determined, however, that the CLECs' complaint did not seek a review of the reasonableness of their rates. For this reason the court felt they had inadequate notice and a chance to prepare a defense of their rates.

■ The argument of whether the IUB violated the CLECs' due-process rights is a constitutional question. Determining the constitutionality of an agency's decision is exclusively a judiciary function, and we will, therefore, not give any deference to the agency's determination in that regard. Iowa Code § 17A.19(11)(*b*); *ABC Disposal Sys., Inc., v. Dep't of Natural Rec.,* 681 N.W.2d 596, 605 (Iowa 2004). Our review on whether the CLECs' due-process rights were violated is de novo. *ABC Disposal,* 681 N.W.2d at 605.

■ We do not find any due-process violations. The CLECs must have known from the beginning that tariff rates were a core issue in the dispute. They were also aware that the IUB's authority under Iowa Code section 476.11 was broad, general, and comprehensive for telephone companies in Iowa. *N.W. Bell Tel. Co. v. Hawkeye State Tel. Co.,* 165 N.W.2d 771, 775 (Iowa 1969). This authority is not affected by which of the parties files a complaint.

Indeed, as the IUB points out, other statutes impose an affirmative duty on the IUB to assure that tariff rates are lawful and will foster competition. Iowa Code §§ 476.1, 476.95(2). The parties thoroughly contested the rate issue during the five-day hearing and offered evidence and thereafter submitted briefs. The CLECs certainly were not blindsided by a determination of this issue.

■ **II.** As a part of its decision, the IUB waived one of its own rules, Iowa Administrative Code rule 199—22.14(2)(*d*)(1). This rule requires that all intrastate access tariffs must include the CCL charge, a three-cent-per-minute charge for both originating and terminating access. Pursuant to Iowa Code section 17A.9A, the legislature has delegated authority to the IUB to waive its own rules

upon petition. Iowa Code § 17A.9A. The CLECs contend, however, that the IUB has no authority to *sua sponte* waive one of its rules.

The district court ruled the IUB lacks authority to waive one of its own rules *sua sponte*, finding that Iowa Code section 17A.9A requires that "a 'person' must bring the petition [for waiver] in order to insure the IUB does not arbitrarily and capriciously set aside policy developed through a formal rulemaking process." In determining whether the IUB had the authority to waive one of its own rules *sua sponte*, we must determine whether the IUB's waiver *sua sponte* was "[b]eyond the authority delegated to the agency by any provision of law or in violation of any provision of law." Iowa Code § 17A.19(10)(*b*).

The IAPA clearly requires that a "person" must petition the agency before the agency can waive one of its rules. Iowa Code § 17A.9A(1). If a party requests a waiver, the IAPA contains specific safeguards and procedures. Iowa Code § 17A.9A(2)-(5). The IUB, however, has its own waiver rule, which provides in relevant part:

> In response to a request, or on its own motion, the board may grant a waiver from a rule adopted by the board, in whole or in part, as applied to a specific set of circumstances. . . .

Iowa Admin. Code r. 199—1.3. Although the IUB's rule allows the IUB to grant a waiver from one of its own rules, this rule is inconsistent with the clear and unambiguous terms of section 17A.9A and beyond the authority delegated to the IUB. Therefore, we conclude the IUB's waiver of one of its own rules, Iowa Administrative Code rule 199—22.14(2)(*d*)(1), was improper.

■ **III.** AT&T contends that Iowa Code section 477.11 only requires IXCs to connect physically with local exchange carriers and does not require IXCs to purchase the CLECs' intrastate access services. This contention is contrary to our holding in *Northwestern Bell Telephone Co.*, 165 N.W.2d at 775, in which we explained that:

> [Iowa Code] section 488.11 [now section 477.11] makes abundantly clear its purpose is to insure that any local telephone exchange within the state . . . which desires connection with the lines of a long distance telephone company shall have such facilities furnished it on an equal basis in order to avoid discrimination among various exchanges.

AT&T makes a similar claim respecting Iowa Code section 476.101(9). Under section 476.101(9), AT&T cannot "take any action that disadvantages a customer who has chosen to receive services from another telecommunications carrier." Accordingly, AT&T contends that refusing to purchase calls from the CLECs has not disadvantaged any end users, since AT&T has never blocked any calls. We agree, though, with the IUB:

> If the Board were to rule that AT&T can refuse to pay these CLEC access charges, the inevitable result would be call blocking by the CLEC or by AT&T, with the result that the CLECs' customers would be unable to receive calls from other callers who use AT&T services and unable to place calls to persons who use AT&T's toll-free numbers.

Whether the IUB erroneously interpreted Iowa Code sections 477.11 and 476.101(9) is guided by one of two enumerated provisions of Iowa Code section 17A.19(10). *See ABC Disposal*, 681 N.W.2d at 602. Paragraph (*c*) of Iowa Code section 17A.19(10) permits relief from agency action:

> Based upon an erroneous interpretation of a provision of law whose interpreta-

tion has not clearly been vested by a provision of law in the discretion of the agency.

Iowa Code § 17A.19(10)(*c* ). Paragraph (*l* ) allows relief when agency action is:

Based upon an irrational, illogical, or wholly unjustifiable interpretation of a provision of law whose interpretation has clearly been vested by a provision of law in the discretion of the agency.

Iowa Code § 17A.19(10)(*l* ).

We conclude that Iowa Code section 17A.19(10)(*l* ) applies to our review of this issue. The IUB has been granted broad authority by the legislature to regulate the rates and services of public utilities. Iowa Code § 476.1. Additionally, the legislature has granted the IUB regulatory authority pertaining to enforcement of civil penalties. Iowa Code § 476.1B(1)(*d* ); *see also* Iowa Code § 476.3 (providing the IUB authority to investigate complaints).

We hold the IUB's interpretation of Iowa Code sections § 477.11 and § 476.101(9) was not "[b]ased upon an irrational, illogical, or wholly unjustifiable interpretation of the law."

■ **IV.** AT&T argues that the IUB erred because the constructive-order doctrine does not apply here. Whether the IUB correctly interpreted and applied this doctrine is a legal question. Because the legislature has not delegated any special authority or power to the IUB to interpret the constructive-order doctrine, our review is for the correction of errors. Iowa Code § 17A.19(10)(*c* ), 11(*b* ); *see also P.D.S.I. v. Peterson,* 685 N.W.2d 627, 633 (Iowa 2004). "We are free to substitute our judgment de novo" for the IUB's interpretation and application of the constructive-order doctrine. *ABC Disposal,* 681 N.W.2d at 596. The IUB's factual determinations, however, are "clearly vested by a provision of law in the discretion of the agency" pursu-

ant to Iowa Code chapter 476, which grants the IUB the broad authority to regulate the rates and services of public utilities. Iowa Code § 17A.19(10)(*f* ). Pursuant to this broad general power, the IUB must necessarily make factual determinations to determine those rights. *P.D.S.I.,* 685 N.W.2d at 633. We are therefore bound to the IUB's factual determination if supported by substantial evidence. Iowa Code § 17A.19(10)(*f* ); *Mosher v. Dep't of Inspections & Appeals,* 671 N.W.2d 501, 508 (Iowa 2003).

■ As mentioned, the IUB found AT&T constructively ordered the services. Under the "constructive order" doctrine, a party constructively ordered a carrier's services when the party "(1) is interconnected in such a manner that it can expect to receive access services; (2) fails to take reasonable steps to prevent the receipt of the access services; and (3) does in fact receive such services." *Advamtel, L.L.C. v. AT&T Corp.,* 118 F.Supp.2d 680, 685 (E.D.Va.2000). AT&T argues that the "constructive order" doctrine arises only when the tariff does not define "order" and is therefore needed to fill a gap with a common-law definition. We reject the argument because the "constructive order" doctrine applies to those situations in which the services are not ordered in the manner prescribed by the tariff. *Id.* at 684–85.

Alternatively, AT&T argues that, even if the constructive-order doctrine was applicable, the IUB used the wrong test for determining whether there was a constructive order. AT&T thinks the test used creates a strict-liability standard. And this test creates a strict-liability standard that would always result in a constructive order. We think these contentions were correctly rejected in *Advamtel,* 118 F.Supp.2d at 684–85 (holding tariff rates apply under the filed-rate doctrine even

though AT&T had not ordered the services it prescribed) (citing *United Artists Payphone Corp. v. New York Tel. Co.*, 8 F.C.C.R. 5563 ¶ 13 (Aug. 18, 1993)). We are not persuaded by AT&T's attempt to distinguish this case from the holding in *Advamtel.*

**V.** The IUB ordered a reduction in the tariffs due from AT&T for connecting through them, but only prospectively—from the date of its order. AT&T complains that, because the tariffs were found to be unreasonable, a reduction should have been ordered to apply retroactively as well.

 Our standard of review of the IUB's order is the same as in Issue III. The district court correctly affirmed the IUB on this issue. The filed-rate doctrine provides that the legal rights of the utility in the customer are measured exclusively by the published tariff. "Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper." *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 126, 110 S.Ct. 2759, 2765–66, 111 L.Ed.2d 94, 108 (1990) (quoting *Keogh v. Chicago & N.W. Ry.,* 260 U.S. 156, 163, 43 S.Ct. 47, 49, 67 L.Ed. 183, 187 (1922)), *cited with approval in Teleconnect Co. v. U.S. West Communications Co.,* 508 N.W.2d 644, 647 (Iowa 1993). So the tariff rate on file was applicable and enforceable until it was found to be unlawful. Although the IUB may have ordered retroactive application of the reduction of tariffs, it certainly was not compelled to do so. The IUB's interpretation was not "[b]ased upon an irrational, illogical, or wholly unjustifiable interpretation of a provision on law." *See* Iowa Code § 17A.19(10)(*l* ). AT&T cannot institute a challenge to the rate merely by not paying the bill. The district court was right in so holding.

Accordingly, we affirm the district court's decision affirming the IUB's ruling that AT&T constructively ordered services from the CLECs and must pay the tariffed rates for past services. We also affirm the district court's decision reversing that portion of the IUB ruling setting a prospective rate. We remand to the district court, which must then return the case to the IUB to proceed in a manner consistent with this opinion. Tax costs on appeal one-half to AT&T and one-half to the CLECs.

**AFFIRMED AND REMANDED.**