**ADVAMTEL, LLC, et al., Plaintiffs,**

v.

**AT & T CORP., Defendant.**

**No. Civ.A. 00–643–A.**

United States District Court, E.D. Virginia, Alexandria Division.

July 21, 2000.

Douglas P. Lobel, Joseph F. Yenouskas, Kelley, Drye & Warren, L.L.P., Washington, DC, for plaintiffs.

Mary Catherine Zinsner, James C. Roberts, Dabney J. Carr, IV, Mays & Valentine, L.L.P., McLean, VA, for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this collection action brought by sixteen[1] competitive local exchange carriers ("CLECs"), against two long distance carriers, AT & T Corp. ("AT & T") and Sprint Communications Company ("Sprint"),[2] a

---

1. Although the First Amended Complaint identifies eighty-nine plaintiffs, there are essentially only sixteen distinct plaintiffs and the remaining seventy-three are related operating subsidiaries of one or another of the sixteen distinct parent companies.

2. Plaintiffs' claim originally included Sprint as a defendant. By Order dated June 23, 2000, the claims against AT & T and Sprint were severed, and have since proceeded separately under different civil action numbers. *See Advamtel, LLC, et al, v. AT & T Corp., et al.,* Civ. A. *No. 00–643–A,* Order dated June 23, 2000. The reasons for that ruling are set forth herein. Plaintiffs' claims against Sprint, and Sprint's counterclaims, raised similar issues to those presented here, and are considered in a companion Memorandum Opinion. *See Advamtel, LLC, et al. v. Sprint Communi-*

threshold dismissal motion raises several issues, including (i) whether all or portions of the case should be referred to the Federal Communications Commission ("FCC") under the doctrine of primary jurisdiction,[3] (ii) whether any portions of the case not referred should be stayed or dismissed pending the FCC's resolution of the referred claims, and (iii) whether plaintiffs' cases and the cases against AT & T and Sprint should be severed under Rule 20, Fed.R.Civ.P.

## I.

The instant dispute arises from plaintiffs' thus far unsuccessful efforts to collect fees allegedly owed to them by AT & T for use of plaintiffs' local exchange networks in routing long distance telephone calls. AT & T denies it ordered routing services from plaintiffs, and has refused to pay the fees. Accordingly, warranted here is a brief description of the relationship between CLECs, such as plaintiffs, and long-distance carriers, such as AT & T.[4]

Local exchange carriers ("LECs") provide local telephone service to subscribers in the areas where they operate. There are two types of LECs, CLECs, such as plaintiffs, and established or incumbent LECs, such as Bell Atlantic, which operated as monopolies in a given area until the Telecommunications Act of 1996 opened the local phone service market by providing for the emergence of new LECs, the CLECs, to compete with the so-called "Baby Bells."[5] *See* 47 U.S.C. § 251 *et seq.*

Local telephone networks are needed not only for making local calls, but also to originate and terminate long-distance calls. Typically, when an end user dials a long-distance number, the LEC serving that customer routes it to the customer's long-distance carrier. *This service is referred to as "originating access."* The long-distance carrier then routes the call to the local carrier serving the called customer and that local carrier completes the call by routing it to the called customer. This service is referred to as "terminating access." As long-distance calls generally cannot be completed without originating and terminating access from the local telephone network, AT & T and other long distance carriers must order access services from the LEC, whether a CLEC or an incumbent LEC, that serves the end user. These LECs then impose access charges on the long distance carriers in exchange for access to the local network to originate and terminate long-distance calls. Because the incumbent LECs' wires are usually the only connection between a household or business and the rest of the local network, the CLECs generally interconnect with the incumbent LECs' local network in providing local service, and the long-distance carriers' networks generally connect to the incumbent LECs' network, not the CLECs' network. The CLECs impose access charges on long-distance carriers for calls that travel over the incumbent LECs' network, but only after the fact. Thus, when a long-distance carrier receives calls from an incumbent LEC's network, it does not know, at that time, the identity of the CLEC or incumbent LEC that directed the call to the long-distance carrier.

Pursuant to FCC requirements, telecommunications carriers, such as plaintiffs, file tariffs which, upon FCC approval, gov-

---

*cations Co., Civ. A. No. 00–1074–A,* Memorandum Opinion dated July 17, 2000.

**3.** *See, e.g., Environmental Tech. Council v. Sierra Club,* 98 F.3d 774, 789 (4th Cir.1996). The FCC is the expert regulatory agency on affairs relating to telecommunications carriers. *See AT & T Corp. v. PAB, Inc.,* 935 F.Supp. 584, 590 (E.D.Pa.1996).

**4.** For a more detailed description of the relationship between CLECs and long distance exchange carriers, see *Advamtel, LLC, et al. v. Sprint Communications Co.,* Civ. A. No. 00–1074–A, Memorandum Opinion dated July 17, 2000.

**5.** After the break-up of AT & T in 1982, the Bell operating companies were granted monopolies in the local phone service market. *See AT&T Communications of Va., Inc. v. Bell Atlantic–Virginia, Inc.,* 35 F.Supp.2d 493, 494 (E.D.Va.1999).

ern their rate structure and establish procedures for ordering and canceling a carrier's service. *See* 47 U.S.C. § 153(h); *MCI Telecomm. Corp. v. Dominican Communication Corp.*, 984 F.Supp. 185, 187 (S.D.N.Y.1997). Tariffs have been defined as "essentially offers to sell on specified terms, filed with the FCC and subject to modification or disapproval by it." *Cahnmann v. Sprint Corp.*, 133 F.3d 484, 487 (7th Cir.1998). As tariffs are filed with the FCC, they are available for public view. *See MCI Telecomm. Corp. v. FCC*, 765 F.2d 1186, 1189 (D.C.Cir.1985). Plaintiffs filed tariffs with the FCC, and these tariffs governed their dealings with other common carriers, such as AT & T. *See Cincinnati Bell Telephone Co. v. Allnet Communications Serv. Inc.*, 17 F.3d 921, 924 n. 4 (6th Cir.1994).

AT & T began receiving originating and terminating access service from plaintiffs in April 1997. Since that time, plaintiffs have submitted invoices to AT & T, containing information reflecting the access services utilized by AT & T and the applicable tariffs. Since November 1998, however, AT & T has refused to pay the tariff rates for these access services, claiming that it did not order plaintiffs' services because it considered plaintiffs' tariff rates to be unreasonable.[6] In short, AT & T contends, it has no obligation to pay for services it did not request.

In April, plaintiffs filed a two-count complaint against Sprint and AT & T; Count I seeks to collect access charges at the published tariff rate for originating and terminating long-distance calls and Count II

states a claim for violations of the Communications Act, 47 U.S.C. § 201, unjust and unreasonable practices by a common carrier. In June, AT & T filed a counterclaim in which it stated six claims: (i) engaging in unreasonable practices, in violation of § 201 of the Communications Act, (ii) imposing charges different from the charges specified in the applicable tariffs, in violation of § 203 of the Communications Act,[7] (iii) charging unreasonable rates, in violation of § 201 of the Communications Act, (iv) using illegal cross-subsidies, in violation of § 254(k) of the Communications Act,[8] (v) engaging in intentional and prospective interference with contract in violation of state common law, and (vi) a claim for a declaratory judgment, under 28 U.S.C. § 2201, that AT & T has the right to refuse to order plaintiffs' access services. Sprint also filed a counterclaim.[9] Threshold dismissal motions by both AT & T and Sprint raise several issues, namely (i) whether all or portions of the case should be referred to the FCC under the doctrine of primary jurisdiction, (ii) whether any portions of the case not referred should be stayed or dismissed pending the FCC's resolution of the referred claims, and (iii) whether the claims against AT & T and Sprint should be severed under Rule 20, Fed.R.Civ.P.

## II.

### A. *Primary Jurisdiction*

■■■■ Although AT & T has not moved for referral of the case to the FCC on primary jurisdiction grounds,[10] it is appar-

---

**6.** The Communications Act forbids telecommunications carriers from engaging in any "unjust" or "unreasonable" practice or from charging "unreasonable" rates. *See* 47 U.S.C. § 201.

**7.** Section 203(c) of the Communications Act, provides that "no carrier shall charge, demand, collect or receive a greater or less or different compensation" for any interstate wire communication "than the charges specified in the schedule then in effect.".

**8.** Section 254(k) provides that a "telecommunications carrier may not use services that are

not competitive to subsidize services that are subject to competition."

**9.** Sprint's counterclaim was referred, in its entirety, to the FCC pursuant to the doctrine of primary jurisdiction. *See Advamtel, LLC, et al. v. Sprint Communications Co.*, 105 F.Supp.2d 476 (E.D.Va. 2000).

**10.** Sprint moved to refer of all or portions of the case to the FCC, and to stay or dismiss any portions of the case not referred. *See Advamtel, LLC*, 105 F.Supp.2d at —— (2000).

ent that AT & T's counterclaims implicate the doctrine of primary jurisdiction, and accordingly, the appropriateness of referral to the FCC must be addressed. Under the doctrine of primary jurisdiction, when a claim pending before a court "requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body," judicial proceedings are stayed "pending referral of such issues to the administrative body for its views." *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). The purpose of the doctrine is to "coordinate administrative and judicial decision-making by taking advantage of agency expertise and referring issues of fact not within the conventional expertise of judges or cases which require the exercise of administrative discretion." *Environmental Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir.1996). By dividing decision-making authority, the doctrine serves to promote "proper relationships between the courts and administrative agencies charged with particular regulatory duties." *Western Pac.*, 352 U.S. at 63, 77 S.Ct. 161. It also serves judicial economy because the dispute may be decided by the administrative agency and obviate the need for court intervention. *See Ryan v. Chemlawn Corp.*, 935 F.2d 129, 131 (7th Cir.1991). But, courts must also balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings. *See Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289, 321, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973).

A relevant example illustrates the application of the doctrine. One issue typically referred to the FCC under the primary jurisdiction doctrine is the reasonableness of a carrier's tariff because that question requires the technical and policy expertise of the agency,[11] and because it is important to have a uniform national standard con-

cerning the reasonableness of a carrier's tariff, as a tariff can affect the entire telecommunications industry. *See MCI Telecommunications Corp. v. Ameri–Tel, Inc.*, 852 F.Supp. 659, 665 (N.D.Ill.1994). On the other hand, the doctrine of primary jurisdiction does *not* apply to an action seeking the enforcement of an established tariff. Because a tariff is essentially an offer to contract,[12] such an action is simply one for the enforcement of a contract. As such, enforcement of a tariff to collect amounts due under it is well within the ordinary competence of courts. *See AT & T Corp. v. PAB*, 935 F.Supp. 584, 590 (E.D.Pa.1996).

█ Under this approach, only Counts III (unreasonable rates in violation of § 201 of the Communications Act) and IV (cross-subsidy in violation of § 254(k) of the Communications Act) of AT & T's counterclaim are amenable to referral on primary jurisdiction grounds. Count III plainly should be referred to the FCC because it is a direct challenge to the reasonableness of plaintiffs' rates. *See National Communications Ass'n. v. AT & T Co.*, 46 F.3d 220, 223 (2d Cir.1995); *PAB*, 935 F.Supp. at 590. As to Count IV, while it does not directly challenge the reasonableness of plaintiffs' rates, it is nonetheless properly referred to the FCC because its resolution depends on an assessment of whether plaintiffs are relying on excessively high access service rates as a means of subsidizing their local exchange service, for which, AT & T claims, their rates are excessively low. In essence, in Count IV, AT & T claims that plaintiffs charge low, even unprofitable, rates for local exchange service as a means of attracting customers, and, as a result, plaintiffs must charge the long distance carriers exorbitant rates for access services. AT & T alleges that this practice runs afoul of § 254(k) of the Communications Act, which states, in pertinent part, that "a telecommunications carrier may not use services that are not competitive to subsidize ser-

---

11. *See, e.g., National Communications Ass'n., Inc. v. AT & T Co.*, 46 F.3d 220, 223 (2d Cir.1995); *AT & T Corp. v. PAB*, 935 F.Supp. 584, 590 (E.D.Pa.1996).

12. *See Cahnmann*, 133 F.3d at 487.

vices that are subject to competition." 47 U.S.C. § 254(k). It follows, therefore, that resolution of Claim IV requires determining (i) whether plaintiffs' tariffs establish unreasonably high rates for long distance access services and (ii) whether the revenue generated from these allegedly exorbitant rates is used to subsidize local exchange service. Thus, adjudication of Claim IV requires an evaluation of the reasonableness of plaintiffs' rates for both local exchange service and long distance access service, issues that are plainly within the FCC's special competence and primary jurisdiction. *See National Communications Ass'n.*, 46 F.3d at 223 (holding that statutory reasonableness of a tariff should be reviewed by an agency).

■ With regard to the four remaining AT & T counterclaims, however, the conclusion is different. Each of these counterclaims involves a threshold legal question, namely whether plaintiffs had a right to bill AT & T for the access services at issue in this case. This question is well within the ordinary competence of courts. AT & T's counterclaims are premised on the assertion that, under plaintiffs' filed tariffs, which establish a procedure for ordering plaintiffs' access services, it did not order such services. If AT & T never ordered plaintiffs' access services, AT & T cannot be forced to pay plaintiffs for those services. *See AT & T v. City of New York*, 83 F.3d 549, 552 (2d Cir.1996); *United Artists Payphone Corp. v. New York Tel. Co.*, 8 FCCRcd. 5563, 5567 (1993). Thus, Count I alleges that plaintiffs engaged in an unreasonable practice, in violation of § 201 of the Communications Act, by sending and receiving traffic to and from AT & T's network even though AT & T claims it did not order those services. Count II alleges that by billing AT & T for access services which AT & T never ordered, contrary to the terms of their filed tariffs, plaintiffs violated § 203 of the Communications Act which prohibits a carrier from demanding or collecting any compensation not authorized by its tariff. Count V alleges that plaintiffs intentionally interfered with AT & T's

relationship with its customers by inducing them to accept plaintiffs' local exchange services by falsely representing to them that AT & T had subscribed to or requested plaintiffs' access services. Finally, Count VI seeks a declaratory ruling that AT & T had a right under the Communications Act to refuse to order plaintiffs' access services. Manifestly, resolution of these claims turns on whether AT & T ordered plaintiffs' access services.

Whether AT & T ordered access services from plaintiffs is a matter that falls squarely within the experience and expertise of courts generally. First, LECs, such as plaintiffs here, establish procedures for ordering their services in their tariffs, which are filed with the FCC. *See* 47 U.S.C. § 153(h), *Dominican Communication Corp.*, 984 F.Supp. at 187. Tariffs are "essentially offers to sell on specified terms, filed with the FCC and subject to modification or disapproval by it." *Cahnmann*, 133 F.3d at 487. In other words, they are offers to contract. When a long distance carrier orders a LEC's access services, it has accepted the offer made by that LEC in its filed tariff, and the LEC is then entitled to bill that long distance carrier for services rendered. It follows that an entitlement to bill issue, such as the one raised by AT & T's counterclaims, is essentially similar to a typical contract dispute involving issues of contract formation through offer and acceptance. It further follows that the entitlement to bill issue is within the competence and usual experience of courts. *See PAB*, 935 F.Supp. at 590 ("Contract and tariff enforcement is clearly within the scope of this Court's expertise and does not warrant referral.").

In the case of one plaintiff, CTSI, AT & T admits it initially ordered and paid for access services, but claims that it subsequently canceled the service. The issue with respect to CTSI's claim, therefore, is not whether AT & T ever ordered the service, but instead whether the steps taken by AT & T to cancel the service were effective to terminate AT & T's status as a customer under CTSI's tariff. But, for the purposes of primary jurisdiction, the issues

of cancellation and ordering are essentially similar; both must be evaluated in light of the provisions of CTSI's filed tariff, which establishes procedures both for ordering CTSI's services and for canceling them. And, as noted above, enforcement of a tariff is within the ordinary experience and expertise of courts because it requires no more than application of traditional contract law principles. *See PAB*, 935 F.Supp. at 590. In sum, neither the ordering nor the cancellation issue should be referred to the FCC.[13]

### B. Stay of the Remaining Claims and Counterclaims

■ Still remaining is the question whether to stay the unreferred claims, i.e., plaintiffs' claim and the four remaining AT & T counterclaims, pending the FCC's resolution of the two referred counterclaims. A court may, in its discretion, stay proceedings pending determination by an administrative agency pursuant to the doctrine of primary jurisdiction. *See Reiter v. Cooper*, 507 U.S. 258, 268–69, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). Whether or not to stay a claim pending the agency determination is a matter of equity. *See id.* at 270, 113 S.Ct. 1213.

In the instant case, a stay or dismissal of plaintiffs' claim and the four remaining AT & T counterclaims is not warranted. The crux of the dispute between AT & T and plaintiffs is whether AT & T ordered plaintiffs' access services. If AT & T ordered these services, it must pay plaintiffs for

them. If the services were not ordered, the result is less clear: AT & T may or may not have to pay for any services that were used. As explained above, resolution of whether AT & T ordered plaintiffs' services is a matter of contract and tariff enforcement, which is well within the ordinary competence of courts. Significantly, this issue is the predicate, or primary issue, while the referred issue of the reasonableness of plaintiffs' published tariff rates is secondary. In other words, determining whether AT & T ordered plaintiffs' access services does not depend in any way on the resolution of the issues referred to the FCC, namely whether plaintiffs' rates are reasonable.[14] Furthermore, because proceedings before an administrative agency typically take several years, a stay would significantly delay resolution of this case. *See National Communications Ass'n*, 46 F.3d at 225 (finding that the FCC would likely take two to five years to resolve the case if it was referred). As a result, a stay of the unreferred claims and counterclaims is not appropriate.

### C. Motion to Sever Claims and Parties

■ AT & T also moved to sever plaintiffs' claims, and the claims against the two defendants, on the ground that plaintiffs' claims, and the claims against Sprint and AT & T, do not arise out of the same "transaction, occurrence, or series of transactions or occurrences" as required by Rule 20(a), Fed.R.Civ.P.[15] Whether claims are properly joined under Rule 20 is determined on a case-by-case basis. *See*

---

**13.** This result finds further support in the principle that where, as here, the FCC has already issued guidance on an issue, a primary jurisdiction referral is unwarranted. *See AT & T Communications v. Bell Atlantic–Virginia, Inc.*, 35 F.Supp.2d 493, 498 (E.D.Va. 1999) (finding that where a case involves an issue that would otherwise be appropriate for a primary jurisdiction referral, there is no need to refer that issue to the agency if the agency has already ruled on it); *see also MGC Communications, Inc. v. AT & T*, 14 FCCRcd. 11647, 11698 (1999) (holding that "a party wishing to terminate services under a tariff [must] explicitly and unequivocally state its intention and act in a manner consistent with that intention.").

**14.** The parties presented no evidence on whether adjudication of the claims referred to the FCC will be affected by the resolution of the unreferred claims. In any event, even assuming that the adjudication of the claims before the FCC does *not* depend on the resolution of the unreferred claims, there is still no reason to stay the unreferred claims, as they may be resolved independent of the claims referred to the FCC.

**15.** Rule 20(a) states, in pertinent part:

All persons may join in one action as plaintiffs if they assert any right to relief ... arising out of the same transaction, occurrence, or series of transactions or occur-

**514**

*Saval v. BL Ltd.*, 710 F.2d 1027, 1031 (4th Cir.1983). The "transaction or occurrence" test in the rule is designed to permit all reasonably related claims for relief by or against different parties to be tried in a single proceeding. *See id.* Absolute identity of all events is not necessary, and the rule should be construed in light of its purpose, which is to promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits. *See id.*

■ In this case, the joinder of plaintiffs' claims is appropriate, but the joinder of the defendants is not. Under the "transaction or occurrence" test, which should be construed broadly,[16] it is reasonable to conclude that plaintiffs' claims arose from the same series of transactions or occurrences, as required by Rule 20(a). All of the claims arose from long-distance calls that were routed from plaintiffs' local networks to AT & T's and Sprint's long-distance networks. The routing of calls in this manner occurs continuously as a regular part of business, and, because all of the calls are carried on the incumbent LEC's network, the long distance carriers do not know beforehand which CLEC is routing the call. Given this, one can reasonably conclude that the routing of the calls is the same series of transactions or occurrences because each call is routed in the same manner, regardless of which plaintiff CLEC is originating the call. Furthermore, while some facts, such as the particular tariff rates filed by each CLEC, may be different, there are facts and law that are common to each claim, namely the existence of a filed tariff rate and the failure to pay by a long distance carrier.

AT & T's reliance on *Saval*,[17] is misplaced. In that case, the plaintiffs, various car owners, brought suit against the manufacturer, distributor and dealer of Jaguar automobiles, alleging that their cars had six different unrelated defects. The Fourth Circuit held that the "transaction or occurrence" test was not satisfied where the "cars were purchased at different times, were driven differently and had different service histories," and plaintiffs had not demonstrated that "any of the alleged similar problems resulted from a common defect." *Id.* at 1031 (internal quotation marks omitted). In other words, in *Saval*, the only connection between the various plaintiffs' claims was the make of the car and the fact that all cars had frequent mechanical trouble; but, the *claims* were different because the cars were all bought and repaired under different circumstances, and, in fact, had different mechanical problems. *See id.* Here, on the other hand, all of plaintiffs' calls are routed to each defendant's network in the same manner and each call is treated identically. Indeed, a long distance carrier does not even know which CLEC is routing the call to it, as all calls come from the incumbent LEC's link to the long distance carrier's network. And, while the *Saval* plaintiffs' car purchases and repairs were isolated events, plaintiffs here are continuously routing calls to the long distance carriers' networks as a regular part of their business. Thus, in this case, unlike *Saval*, the transactions, i.e., the routing of the long distance calls, occur in a series, as required by Rule 20(a).[18]

The joinder of Sprint and AT & T as defendants, however, is inappropriate.

rences and if any question of law or fact common to all these persons will arise in the action. All persons ... may be joined in one action as defendants if there is asserted against them ... any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

**16.** *See Mosley v. General Motors Corp.*, 497 F.2d 1330, 1332 (8th Cir.1974) (" 'Transaction' is a word of flexible meaning. It may

comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship.") (citing *Moore v. New York Cotton Exch.*, 270 U.S. 593, 610, 46 S.Ct. 367, 70 L.Ed. 750 (1926)).

**17.** 710 F.2d at 1027.

**18.** Furthermore, the *Saval* plaintiffs, unlike the instant plaintiffs, brought suit under a statutory framework designed to restrict access to the federal courts and they needed to

While one can reasonably conclude that the routing of calls from several local exchange carriers over one network to a long distance carrier forms the same "series of transactions," the routing of calls to two different long distance carriers is not the same series of transactions. Here, plaintiffs allege a series of individual transaction between them and AT & T on the one hand and between them and Sprint on the other. The claims against Sprint plainly do not arise out of the same series of transactions as the claims against AT & T. Each plaintiff had dealings with AT & T that were similar to every other plaintiff's dealings with AT & T, and each plaintiff had dealings with Sprint that were similar to every other plaintiff's dealings with Sprint, but plaintiffs did not have dealings with Sprint that were similar to their dealings with AT & T, except that both defendants have challenged the reasonableness of plaintiffs' tariff rates. Nor do plaintiffs allege that defendants acted in concert in this regard. Indeed, the evidence suggests that they did not, for while AT & T sought to avoid using plaintiffs' networks, Sprint simply sought to pay plaintiffs an amount less than the filed tariff rate.[19] This indicates that the case against each defendant may well proceed quite differently, which is yet another argument against joinder of these defendants. Where, as here, the nature of the defendants' cases is different, joinder does not necessarily streamline the resolution of the case, and indeed may lead to confusion at trial. *See Saval,* 710 F.2d at 1031 (finding that the purpose of Rule 20(a) is "to promote trial convenience and expedite the final determination of disputes").

### III.

In conclusion, Counts III and IV of AT & T's counterclaim will be referred to the

FCC under the doctrine of primary jurisdiction. All remaining claims and counterclaims will proceed to resolution on the merits, and the cases against Sprint and AT & T are severed.

An order has issued with respect to the severance issue. An appropriate order will issue with respect to the primary jurisdiction issue.

---

aggregate their claims in order to satisfy the jurisdictional amount, facts which the Fourth Circuit found significant. *See id.* at 1031–32 ("Allowing joinder of these appellants' claims would not further the policies behind § 2310(d) [of the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*,] which is to restrict access to federal courts.").

**19.** *See Advamtel, LLC, et al. v. Sprint Communications Co.,* 105 F.Supp.2d 476 (E.D.Va. 2000).