**ADVAMTEL, LLC et al., Plaintiffs and Counterclaim–Defendants,**

v.

**SPRINT COMMUNICATIONS CO. L.P., Defendant and Counterclaim–Plaintiff.**

No. CIV. A. 00–1074–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Jan. 5, 2001.

Douglas Paul Lobel, Kelley, Drye & Warren, Washington, D.C., for Plaintiffs.

Laura Rosenstein White, McGuire Woods, L.L.P., Richmond, VA, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

Plaintiffs, competitive local exchange carriers ("CLECs"), brought this action to collect from defendant, Sprint Communications Co. ("Sprint"),[1] unpaid tariff rates for originating and terminating access charges. Sprint, a long-distance or interexchange carrier ("IXC"), claims it is not obligated to pay these charges (i) because the tariff rates are unreasonable and (ii) because Sprint and AT & T Corp. ("AT & T") claim they never ordered plaintiffs' services. The issue of the reasonableness of the tariff rates was earlier referred to the Federal Communications Commission ("FCC") on primary jurisdiction grounds,[2] and at issue now is Sprint's motion to refer the remaining issues. For the reasons that follow, the motion must be granted in part.

### I

The underlying facts of this dispute are set forth in two Memorandum Opinions already issued in this case. *See Advamtel, LLC v. AT & T Corp.,* 105 F.Supp.2d 507 (E.D.Va.2000) (*"Advamtel I"*); *Advamtel, LLC v. AT & T Corp.,* 118 F.Supp.2d 680 (E.D.Va.2000) (*"Advamtel II"*). Thus, only a brief summary is warranted here.

Plaintiffs are three CLECs—CTC Telecom, Inc. ("CTC Telecom"), Business Telecom, Inc., and Intermedia Communications, Inc.—who provide local telephone service to subscribers in the areas where they operate and originating and terminating access service to IXCs.[3] Local telephone networks are necessary to make local calls and to originate and terminate long-distance calls. Typically, when an end user dials a long-distance number, the CLEC serving that customer routes the call to the customer's long-distance carrier or IXC.[4] This service is referred to as "originating access." The long-distance carrier, the IXC, then routes the call to the local carrier serving the called customer, and that local carrier completes the call by routing it to the called customer. This service is referred to as "terminating access." Thus, long-distance calls generally cannot be completed without originating and terminating access from a CLEC.

Sprint, an IXC, began receiving originating and terminating access services from plaintiffs in April 1997. While Sprint initially paid for these services at the full published tariff rates, it ceased doing so in June 1999, on the ground that the CLECs' tariff rates were unreasonable. Thus, after June 1999, Sprint paid only the amount it deemed to be reasonable for the CLECs' originating and terminating access services. Accordingly, plaintiffs claim that Sprint owes them approximately $2,864,303, the difference between the amount due under the published tariff rates and the amount Sprint has paid.[5] To

---

1. Although plaintiffs originally sued AT & T as well as Sprint, the claims against AT & T were severed from those against Sprint because the factual bases of the claims against AT & T and AT & T's defenses were different from the facts relating to Sprint. *See Advamtel LLC v. AT & T Corp.,* 105 F.Supp.2d 507, 513–15 (E.D.Va.2000).

2. *See Advamtel,* 105 F.Supp.2d at 511–12.

3. Initially, there were sixteen plaintiffs in the action against Sprint. Thirteen have settled with Sprint. In the companion case against AT & T, no settlements have occurred.

4. In addition to CLECs, incumbent local exchange carriers ("ILECs"), *i.e.,* one of the former Baby Bells, also route calls to and from the customer's long-distance carrier or IXC. Only the CLECs' role is relevant here.

5. The facts relating to AT & T are different. AT & T began receiving originating and terminating access service from plaintiffs in April 1997. Since that time, plaintiffs have submitted invoices to AT & T, containing information reflecting the access services utilized by AT & T and the applicable tariffs. Although AT & T initially paid in full for these services, it ceased doing so in November 1998 and since that time has refused to pay any amount on the ground that plaintiffs' tariff rates are "unreasonable," in violation of 47 U.S.C. §§ 201(a), (b). *See Advamtel II,* 118 F.Supp.2d at 682.

collect these charges, plaintiffs filed the instant action in April 2000. Sprint responded, asserting that it is not obligated to pay the tariff rates (i) because the rates are unreasonable and (ii) because Sprint never ordered the CLECs' originating or terminating access services or, alternatively, has taken reasonable steps to cancel any ordered or constructively ordered service. As noted, the first defense—the reasonableness of the rates—has been referred to the FCC on primary jurisdiction grounds. *See Advamtel I,* 105 F.Supp.2d at 511–12.

■ The instant motion seeks to refer Sprint's second defense to the FCC, namely, that no services were ordered, or alternatively, that any services ordered or deemed ordered had been cancelled. This defense has two components: (i) whether Sprint, as an IXC, must pay for services it did not order according to the terms specified in the tariff, *i.e.,* whether an IXC may be deemed under certain circumstances to have constructively ordered a CLEC's services, and, if so, (ii) what steps must an IXC take to cancel services ordered or to avoid the constructive ordering of services. *Advamtel II,* which resolved the parties' cross-motions for summary judgment, addressed the first prong. Typically, long-distance carriers order access services from CLECs according to the ordering provisions specified in their tariffs. Most tariffs require the submission of an Access Service Request ("ASR") to order access services. *Advamtel II* held that IXCs must pay not only for services ordered pursuant to the terms specified in the tariff, but also for those services that are constructively ordered.[6] Thus, remaining for determination after *Advamtel II* is the

second prong of Sprint's defense, which includes three separate questions:

(i) whether any statutory or regulatory constraints prevent Sprint, as an IXC, from terminating or declining services ordered or constructively ordered; and, if not,

(ii) what steps IXCs must take either to avoid ordering or to cancel service after it has been ordered or constructively ordered; and

(iii) whether Sprint has taken these steps.

The first two issues are legal questions and are candidates for referral to the FCC. The third question involves a straightforward determination of fact and is therefore not an appropriate candidate for referral to the FCC.

To help resolve whether questions (i) and (ii) should be referred to the FCC, it is helpful to separate plaintiffs' claims against defendant into four distinct categories. Category I consists of those instances in which Sprint, as an IXC, submitted an ASR to the plaintiff CLEC and then ceased paying for the CLEC's services without taking *any* steps to terminate the services. Category II consists of instances where, like Category I, an IXC has submitted an ASR, but where, unlike Category I, the IXC has taken some steps to cancel the service, such as sending a letter to the CLEC requesting that it cease routing long-distance calls to Sprint. Categories III and IV consist of scenarios where no ASR has been submitted, yet Sprint nonetheless received services from the plaintiff CLECs under circumstances that amount to constructive ordering. Category III consists of claims where Sprint has taken no steps to prevent the receipt of the CLEC's services, while Category IV,

6. *See Advamtel II,* 118 F.Supp.2d at 685. Under the constructive ordering doctrine, an IXC is said to have constructively ordered a carrier's services, even if it has not complied with specific ordering provisions in a CLEC's tariff, when the receiver of services (1) is interconnected in such a manner that it can expect to receive access services; (2) fails to

take reasonable steps to prevent the receipt of access services; and (3) does in fact receive such services. *See id.; In re Access Charge Reform,* 1999 WL 669188, 14 F.C.C.R. 14221, at ¶ 188 (1999); *United Artists Payphone Corp., New York Tel. Co.,* 1993 WL 757204, 8 F.C.C.R. 5563 (1993).

similar to Category II, consists of claims in which Sprint, as an IXC, has taken some steps to cancel the service. A further variable in each scenario is whether the access service in question involves terminating or originating access service.

Viewing plaintiffs' claims as falling into one or another of these categories helps clarify whether referral to the FCC is appropriate. Thus, it is apparent that Category I claims, if any exist, raise no referral issue, as it is clear that Sprint may not escape paying for CLEC services it has properly ordered, but taken no steps to cancel or terminate. As to these claims, summary judgment for plaintiffs is appropriate; Sprint must pay plaintiffs for these services at the tariff rate and seek a refund later, if warranted by the FCC's resolution of the already-referred issue concerning the reasonableness of the tariff. Similarly, plaintiffs' claims in Category III also merit summary judgment, as Sprint must pay plaintiffs for services it received, but took no steps to avoid or cancel. Here again, Sprint's sole remedy, if any, is a refund it may seek, if warranted by the FCC's resolution of the reasonableness of the CLECs' tariff rates. By contrast, claims falling into Categories II and IV are not subject to summary judgment because the two candidate questions for referral, i.e., (i) and (ii) above, must be answered before these claims can be resolved. Put differently, the two legal questions necessarily precede the application of the constructive ordering doctrine

or the determination of whether an IXC took reasonable steps to terminate its relationship with a CLEC from which it received services.[7]

Not surprisingly, given the consequences, the parties dispute the categories in which each remaining plaintiffs' claims belong. Plaintiffs contend that claims brought against Sprint by CTC Telecom are properly in Category I. Sprint disagrees, contending CTC Telecom's claims against Sprint belong in Category II. In this regard, Sprint argues that it took steps to terminate service with CTC Telecom by sending CTC Telecom a letter informing the CLEC that it no longer wished to receive access services at the tariff rate.[8] The parties also dispute the placement of claims by the two remaining plaintiffs: BTI and Intermedia. Plaintiffs argue that the claims brought by these plaintiffs are properly placed in Category III because sending a letter is not sufficient to create a triable issue of fact regarding whether an IXC took reasonable steps to avoid the constructive ordering of services. Sprint disputes this contention and argues that these two plaintiffs should be in Category IV.[9] It is undisputed that in all instances, Sprint sent a letter to the CLEC informing them that it did not want to receive originating or terminating access service at the published tariff rates. The parties dispute whether this action, by itself, constitutes a sufficient step to cancel or avoid receipt of services. While this contention will be addressed in greater

---

7. For example, plaintiffs contend that to cancel or to avoid receipt of a CLEC's services, Sprint should have contacted the shared customers to inform them that they had to switch their local or long-distance carriers. Implicit in this suggestion is that if the shared customer did not switch their local service, that is, their CLEC, Sprint would not route these customers' long-distance calls over its phone lines. If an IXC cannot legally decline a CLEC's access services, the second prong of the constructive ordering doctrine, see supra note 6, is erased, and an IXC must accept a CLEC's originating and terminating access services and pay the tariff rates. In this event, an IXC's sole remedy is to file a peti-

tion in the FCC attacking the reasonableness of a CLEC's tariff rates.

8. There is no dispute that Sprint submitted an ASR to CTC Telecom.

9. A similar dispute exists with AT & T. First, plaintiffs contend that AT & T ordered service from, at least, three plaintiffs: Commonwealth Telephone Enterprises CTSI, Inc., Focal Communications Corp., and Winstar Communications, Inc. Second, plaintiffs contend that AT & T failed to take reasonable steps either to cancel service ordered by these five plaintiffs or to avoid the constructive ordering of service by the remaining plaintiffs.

804

depth, *see infra* Part II, the analysis proceeds on the premise that simply sending a letter to the CLEC is sufficient to place a claim within either Category II or IV, depending on whether an ASR was submitted.

Thus, remaining for consideration on this motion is whether to refer to the FCC on primary jurisdiction grounds the two outstanding legal questions: (i) whether any statutory or regulatory constraints prevent Sprint, as an IXC, from terminating or declining services ordered or constructively ordered, and if not, (ii) what steps IXCs must take either to avoid ordering or to cancel service after it has been ordered or constructively ordered.

## II

■ It is settled that "[n]o fixed formula exists for applying the doctrine of primary jurisdiction," but that "[i]n every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). As an aid to determining whether the doctrine should apply in any given case, courts—including this one—have identified four factors to consider:

(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;

(2) whether the question at issue is particularly within the agency's discretion;

(3) whether there exists a substantial danger of inconsistent rulings; and

(4) whether a prior application to the agency has been made.[10]

Application of this test ensures the coordination of "administrative and judicial decision-making by taking advantage of agency expertise" and referral of "issues of fact not within the conventional experience of judges or cases which require the exercise of administrative discretion." *Advamtel v. Sprint Communications Co.,* 105 F.Supp.2d 476, 480 (E.D.Va.2000) (quoting *Environmental Tech. Council v. Sierra Club,* 98 F.3d 774 (4th Cir.1996)). Finally, this doctrine promotes a uniform development of law and policy in the areas where Congress has delegated to an administrative agency the authority to develop and establish national rules.[11]

■ Applied here, these principles compel the conclusion that questions (i) and (ii) merit referral on primary jurisdiction grounds. To begin with, referral of question (i) is appropriate because the FCC has not yet "clearly and unambiguously" addressed the question of whether an IXC can decline to accept or cancel a CLEC's access services. *Sierra Club v. United States Dep't of Energy,* 734 F.Supp. 946, 950 (D.Colo.1990). Nor is there any doubt that this complex legal and technical question is best addressed in the first instance by the FCC. Parsing question (i) into its constituent parts confirms this result. In the first instance, question (i) is a novel and important legal question, namely, whether the Telecommunications Act ("Act")[12] bars an IXC from declining or terminating a CLEC's access services. This question requires interpretation of

**10.** *AT & T Communications of Va., Inc. v. Bell Atlantic—Va., Inc.,* 35 F.Supp.2d 493, 498 (E.D.Va.1999) (quoting *National Communications Ass'n v. American Tel. & Tel. Co.,* 46 F.3d 220, 223 (2d Cir.1995)); *see Advamtel, LLC v. Sprint Comm. Co.,* 105 F.Supp.2d at 480.

**11.** *See Western Pac. R. Co.,* 352 U.S. at 63–64, 77 S.Ct. 161; *Far East Conference v. United States,* 342 U.S. 570, 574, 72 S.Ct. 492, 96

L.Ed. 576 (1952) ("Uniformity and consistency in the regulation of business entrusted to a particular agency are secured ... by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.").

**12.** *See* 47 U.S.C. § 201 *et seq.*

the provisions of a complex statute. Because neither the FCC nor any court has yet directly addressed this question, referral is appropriate to allow the agency charged with elucidating and implementing the Act the first opportunity to resolve this question.

Question (i) also implicates fundamental technical and policy considerations affecting the nation's telecommunications system. More specifically, if an IXC is legally permitted to cancel or decline to interconnect with a CLEC, the "One Goal" policy of the nation's telephone system—that is, the unfettered ability of customers to place and receive long-distance calls—may be adversely affected. *See, e.g., In the Matter of Access Charge Reform*, 1999 WL 669188, 14 F.C.C.R. 14221, at ¶ 241–42 (1999) (stating that allowing an IXC to decline access services could affect the ability of customers to place and receive long-distance calls). Furthermore, the parties have submitted expert reports that dispute the technical and economic feasibility of an IXC declining to interconnect

with a CLEC or blocking a CLEC's service. Accordingly, these policy and technical considerations are best resolved, in the first instance, by the FCC, the agency with both the expertise in these technical issues and the mandate to elucidate and implement the Act.[13]

Indeed, the FCC has recognized the importance of this question by initiating a rulemaking concerning this precise question.[14] There are, moreover, two cases currently pending before the FCC for adjudication that also present this question.[15] Accordingly, any judgment entered in this case has the potential to undermine the FCC's efforts to resolve this matter through its administrative mechanisms and to create conflicting interpretations of the Act's requirements. *See Carter v. AT & T*, 365 F.2d 486, 496 (5th Cir.1966) (holding that to allow simultaneous and potentially conflicting court and FCC proceedings would be tantamount to "putting judicial imprimatur on operational chaos"). It is only through referral that a consistent, uniform result is assured.[16]

**13.** *See Total Telecomm. Servcs., Inc. v. AT & T*, 919 F.Supp. 472, 478 (D.D.C.1996) ("Primary jurisdiction is invoked in situations where the courts have jurisdiction over the claim from the very outset but it is likely that the case will require resolution of issues, which under a regulatory scheme, have been placed in the hands of an administrative body."); *see also Western Pac. R. Co.*, 352 U.S. at 65, 77 S.Ct. 161; *MCI v. AT & T*, 496 F.2d 214, 220 (3d Cir.1974).

**14.** *See In the Matter of Access Charge Reform*, 1999 WL 669188, 14 F.C.C.R. 14221, at ¶ 242 (1999).

**15.** *See U.S. TelePacific Corp. v. AT & T Corp.*, File No. EB–00–MD–010; *Total Telecomm.*, 919 F.Supp. at 478 (referring issues to the FCC).

**16.** Worth noting is that some plaintiffs, who are participants in the rulemaking before the FCC, have taken positions there on question (i) that conflict with the positions they have taken here. While arguing in this case that IXCs can block or decline access, they argue the opposite in their pleadings to the FCC. Specifically, plaintiffs in the rulemaking have stated that:

(i) "both the Communications Act and the Commission's rules prevent IXCs from declining a CLEC's access service," Reply Comments of Focal Communications Corp., at p. 5, *In the Matter of Access Charge Reform*, CC Docket No. 96–262 (July 24, 2000);

(ii) "AT & T's action [unilaterally to disconnect] is clearly illegal, violating Sections 201(a), 201(b), 202(a), 203(c), 214(a) and 251(a) of the Communications Act." Rural Independent Competitive Alliance, Request for Emergency Relief, at p. i, *In the Matter of Access Charge Reform*, CC Docket 96–262 (Feb. 18, 2000);

(iii) The FCC's decision will "threaten the survival of [CLECs] and the availability of competitive local services alternatives." Rural Independent Competitive Alliance, Request for Emergency Relief, at 3, *In the Matter of Access Charge Reform*, CC Docket 96–262 (Feb. 18, 2000); and

(iv) "serious negative policy consequences" will result from allowing "unilateral disconnection" by an IXC. Reply Comments for the Assoc. for Local Telecommunications Services, *In the Matter of Access Charge Reform*, CC Docket No. 96–262 (Nov. 29, 1999).

■ It is not persuasive to argue, as do plaintiffs, that referral here is inappropriate because the *Access Charge Reform* rulemaking will have only prospective effect. To the contrary, any result reached by the FCC in the rulemaking would be persuasive, if not conclusive, as to questions concerning past events. This is so, because a prospective rulemaking "does not mean that ... [if] the Commission has found conduct unlawful it has thereby found that the identical conduct was lawful in the past." *MCI Telecomm., Inc. Corp. v. FCC,* 10 F.3d 842, 846–47 (D.C.Cir.1993). And, if the FCC determines in the rulemaking that the Act prevents an IXC from declining a CLEC's services in the future, it follows that the Act also prevented an IXC from declining a CLEC's services in the past. In any event, as noted, there are currently pending two adjudicatory proceedings that address the precise question at issue here. Under its adjudicatory authority, the FCC, just as any court, can interpret regulations and statutes and give that interpretation retroactive effect.[17] Thus, a risk of inconsistent results exists, and therefore, question (i) should be referred to the FCC.

Finally, although plaintiffs argue that *MGC Communications, Inc. v. AT & T Corp.,* 1999 WL 503598, 14 F.C.C.R. 11,647 (1999),[18] implicitly answers this question, that argument places more weight on *MGC* than it can bear. Simply put, that decision does not address the legal, technical, or policy considerations inherent in question (i). Specifically, in *MGC,* the FCC left open the possibility that the Act might impose constraints that prevent an IXC from declining a CLEC's access services.[19] Thus, contrary to plaintiffs' suggestion, *MGC* does not authorize an IXC to block its interconnection with a CLEC's access services. Accordingly, referral of question (i) is warranted.

Similarly, referral of question (ii) is also appropriate because, assuming the Act permits an IXC to block interconnection with a CLEC, the FCC has not defined the steps an IXC must take to decline or terminate originating and terminating access service from a CLEC. Plaintiffs' reliance on *MGC* for the contrary proposition again places more weight on this case than it can bear. *MGC* is distinguishable from the instant case and more modest in scope than plaintiffs suggest. First, *MGC* applies, at best, to Category II claims that focus on an IXC's ability to cancel *originating* access service ordered through the submission of an ASR. It does not address, even in dicta, terminating access service in Category II claims or Category IV claims that involve constructive ordering.[20] Fur-

---

By contrast, plaintiffs in this case have assumed *arguendo* that declining or cancelling interconnection with a CLEC's access service can legally be done.

**17.** *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("[W]here legal consequences hinge upon the interpretation of statutory requirements, and where no pre-existing interpretive rule construing those requirements is in effect, nothing prevents the agency from acting retroactively through adjudication.") (Scalia, J. concurring).

**18.** In *MGC,* the complainant, MGC Communications, a CLEC, asserted that AT & T had improperly refused to pay for *originating* access service that AT & T had ordered and accepted. AT & T argued that it had terminated its relationship with MGC, and accordingly, the continued provision of access service constituted the conferral of an unwanted

service for which AT & T was under no obligation to pay. The FCC concluded that AT & T had failed to take reasonable steps to terminate its relationship with MGC.

**19.** *See MGC,* 1999 WL 503598, 14 F.C.C.R. 11,647, at ¶ 12 (stating that despite its ruling, IXCs "remain subject to a broad variety of statutory and regulatory constraints that are too numerous to list here, but which include, without limitation, sections 201, 202, 203, and 214 of the Act and section 63.71 of the Commission's rules ..., [and that the FCC's] analysis is restricted to the issues that MGC has presented").

**20.** As the FCC stated in *MGC,* cancelling originating access is "entirely distinct from the question ... whether an IXC may decline to purchase terminating access service." *MGC,* 1999 WL 503598, 14 F.C.C.R. 11,647, at ¶ 7. If an IXC is permitted to decline originating

thermore, the FCC, in at least one proceeding, has questioned the continuing validity and scope of the *MGC* decision.[21] Accordingly, *MGC* offers scant precedential support or guidance for the resolution of question (ii). *See Sierra Club,* 734 F.Supp. at 950. Accordingly, referral of question (ii) is appropriate as well.

### III

In sum, Sprint's motion to refer is granted in part. Specifically, to resolve those claims that involve Categories II and IV, the following specific questions must be referred to the FCC:

(i) whether any statutory or regulatory constraints prevent Sprint, as an IXC, from terminating or declining services ordered or constructively ordered, and if not,

(ii) what steps IXCs must take either to avoid ordering or to cancel service after it has been ordered or constructively ordered.

It is further appropriate to stay all remaining issues pending the FCC's determination of the referred questions.[22] To ameliorate the effect of delay, the stay will be of limited duration. Specifically, a period of six months appears reasonable.[23] If, at the end of the six month period, the FCC has not ruled on the referred questions, a trial addressing all remaining questions, including those referred to the FCC, will proceed in this Court.

An appropriate Order will issue.

---

access, fewer concerns arise because the calling party has the "choice of service provider, the decision to place the call, and the ultimate obligation to pay for the call." *In the Matter of Access Charge Reform,* 1999 WL 669188, 14 F.C.C.R. 14,221, at ¶ 236. Thus, notice can be given to the calling party that its long-distance calls will not be routed over a certain IXC's phone lines. Blocking *terminating* access service, however, implicates more serious concerns. If an IXC were permitted to decline terminating access service, the result would be disruption and interruption in national long-distance service. Customers could not be notified or informed, in any meaningful way, that their choice of CLEC or long-distance carrier may result in their inability to place long-distance calls. In other words, customers might to unable to receive long-distance calls without any advance notice. Furthermore, it is difficult to conceive of reasonable steps an IXC could take to avoid receipt of terminating access because the IXC has no relationship with the individual to whom a call is placed. *See also U.S. TelePacific Corp. v. AT & T Corp.,* File No. EB–00–

MD–010 (November 1, 2000) (letter from FCC to parties, in post-*MGC* proceeding, requesting briefing on "whom should the burden fall to block or refuse ... access traffic if an IXC wishes not to purchase, or to continue purchasing, the access services of a CLEC")

21. *See In re Access Reform,* 1999 WL 669188, 14 F.C.C.R. 14,221, at ¶ 241 (noting that *MGC* decision did not address the statutory constraints that the Act might impose on the ability of an IXC to decline access services).

22. These issues include, for example, whether AT & T and Sprint submitted ASRs to CLEC and what steps the defendants took to cancel or terminate service.

23. During argument, the parties suggested that six months would provide the FCC with sufficient time to resolve these two questions and perhaps the question of the reasonableness of plaintiffs' tariffs. *See* 47 U.S.C. § 208(b)(1). Resolution of the reasonableness of the tariff rate might moot or aid in the resolution of any remaining issues.