**AT&T CORPORATION, Petitioner**

v.

**FEDERAL COMMUNICATIONS COM-MISSION and United States of America, Respondents**

**Association of Communications Enterprises, et al., Intervenors**

No. 01–1467.

United States Court of Appeals, District of Columbia Circuit.

Argued May 10, 2002.

Decided June 14, 2002.

Peter D. Keisler argued the cause for petitioner. With him on the briefs were David W. Carpenter, James F. Bendernagel Jr., Michael J. Hunseder, Mark C. Rosenblum, and Peter H. Jacoby.

Richard K. Welch, Counsel, Federal Communications Commission, argued the cause for respondents. On the brief were

Jane E. Mago, General Counsel, John E. Ingle, Deputy Associate General Counsel, Rodger D. Citron, Counsel, Robert B. Nicholson and Marion Jetton, Attorneys, U.S. Department of Justice.

Andrew D. Lipman, Russell M. Blau, David Cosson, Glenn B. Manishin, Jonathan E. Canis, Timothy J. Fitzgibbon, Charles C. Hunter and Catherine M. Hannan were on the brief for intervenors Association of Communications Enterprises, et al. Ronald J. Jarvis and Richard J. Metzger entered appearances.

Before: GINSBURG, Chief Judge, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

In October 2001, the FCC issued a declaratory ruling holding that long-distance carriers have an obligation to purchase interstate switched access services provided by competitive local exchange carriers. *See In re AT&T & Sprint Petitions for Declaratory Ruling on CLEC Access Charge Issues,* 16 F.C.C.R. 19158 (2001) ("Declaratory Ruling"). We now grant AT&T's petition for judicial review of this ruling.

## I.

Long-distance telephone carriers (also called "interexchange carriers" or "IXCs") generally do not directly connect to their telephone customers. Rather, long-distance telephone traffic is ordinarily transmitted by a local exchange carrier (also called a "LEC") from its originating customer to an IXC. *See generally United States Tel. Ass'n v. FCC,* 188 F.3d 521, 523–24 (D.C.Cir.1999). Then the "IXC carries the traffic to its region of destination and hands it off to the LEC there." *Id.* at 524. For example, if a customer in Washington, D.C., who subscribes to Verizon for local service and AT&T for long-

distance service, calls a relative in Florida, who subscribes to Bellsouth for local service, the call initially will travel over Verizon's facilities. Verizon will hand off the call to AT&T's facilities, which will carry the call to Florida before handing it off to Bellsouth's facilities for delivery to the caller's relative. AT&T will charge the caller for the telephone call, and will pay "originating" access charges to Verizon and "terminating" access charges to Bellsouth. These interstate access charges— that is, the charges paid to LECs by IXCs for local origination and termination of interstate long-distance telephone calls—are at the heart of this case.

Until recently a single, incumbent local exchange carrier or ILEC, whose access rates were regulated by the FCC, provided all local exchange and exchange access services in a particular region. *See In re Access Charge Reform, Sixth Report and Order,* 15 F.C.C.R. 12962, 12965–67 (2000). The Telecommunications Act of 1996 allowed a new class of competitive local exchange carriers ("CLECs") into the local exchange market. *See In re Access Charge Reform, Seventh Report and Order and Further Notice of Proposed Rulemaking,* 16 F.C.C.R. 9923, 9931 (2001). At first, the FCC left CLECs largely free of the kind of rate regulation applied to monopoly LECs. The assumption was that CLECs' small market share would not allow them to charge unreasonable rates. *See id.* at 9926. This assumption later proved to be incorrect with respect to access charges because CLECs possess a "series of bottleneck monopolies over access to each individual end user." *Id.* at 9935. If an IXC wants to provide long-distance service to customers of a CLEC's local service, the IXC must utilize access services from that particular CLEC. *Id.* When "an end user decides to take service from a particular LEC, that LEC controls an essential component of the system that

provides interexchange calls, and it becomes the bottleneck for IXCs wishing to complete calls to, or carry calls from, that end user." *Id.* In addition, the FCC requires IXCs to geographically average their rates so as to spread the cost of both originating and terminating access over all their end users, thereby precluding IXCs from shifting the burden of high CLEC access rates to those customers who have chosen CLECs that charge unreasonably high access rates. *Id.*

Taking advantage of their control over essential components of the network, some CLECs began charging access rates that were well above the rates ILECs charged for similar services. *See id.* at 9931. While the access rates of some CLECs, for example, were in excess of nine cents per minute, *see id.,* the average interstate access rate the ILECs charged in 2000 was around one cent per minute. *See* Brief of Petitioner at 5.

Because of high access rates, AT&T decided that it did not want to purchase access services from certain CLECs, and it began taking steps to cut off its ties with these companies. AT&T sent letters to CLECs informing them that it would not submit an Access Service Request to a CLEC unless AT&T and the CLEC reached an agreement regarding the access rates to be charged. Nevertheless, some CLECs continued to send long-distance calls from their customers to AT&T and then billed AT&T for that traffic. They were able to do so without AT&T's agreement because the CLECs first routed their traffic to a tandem switch operated by the ILEC in their area. By the time the call reached AT&T's network, it was intermingled with the traffic of other carriers, and AT&T was unable to identify and block the traffic on a CLEC-specific basis.[1]

In response to the CLECs' actions, AT&T filed a petition with the FCC in October 1998 in which it complained that numerous CLECs were charging excessive access rates and refusing to negotiate with AT&T regarding those rates. AT&T requested a declaratory ruling that existing law, policy and regulations do not require IXCs to purchase tariffed access services from CLECs. On August 27, 1999, the FCC determined that a declaratory ruling was not the proper vehicle to resolve the issue. *See In re Access Charge Reform, Fifth Report and Order,* 14 F.C.C.R. 14221 (1999). Instead, it decided to invite comments and initiate a rulemaking regarding the reasonableness of CLEC access charges and whether the FCC might adopt rules to address, by the least intrusive means, any failure of market forces to constrain CLEC access charges.[2] *Id.*

Thereafter numerous CLECs initiated litigation in federal court seeking to force IXCs, such as AT&T, to pay for access charges incurred. *See Seventh Rep. & Order,* 16 F.C.C.R. at 9932 n. 56. In one of the suits, filed January 5, 2000, in the Eastern District of Virginia, the CLECs alleged that they began providing originating and terminating access services to

---

1. At oral argument, AT&T's counsel stated that AT&T could have developed technology to sort out unwanted CLEC traffic but that this technology would have cost $35 to $40 million. *See* Transcript of Proceedings at 6.

2. The FCC eventually issued a rulemaking order requiring IXCs—strictly on a prospective basis after April 2001—to purchase CLEC access services if the rates are set at or below a benchmark rate of 2.5 cents per minute, or the rate charged by the competing ILEC, whichever is higher. *See Seventh Rep. & Order,* 16 F.C.C.R. at 9925, 9941. The benchmark rate, the FCC declared, will decline gradually over a three-year period. *Id.* at 9941. This order is the subject of a separate petition for review in this court. *See AT&T Corp. v. FCC,* No. 01–1244.

AT&T in April 1997 and that AT&T paid for those services at full tariffed rates until November 1998, when AT&T stopped payment. *See Advamtel, LLC v. AT&T Corp.,* No. 00–643–A (E.D. Va.). AT&T responded by denying that it had ordered the services, and by asserting that in one instance, it had canceled the service.

In January 2001, the district court in *Advamtel* referred two legal issues to the FCC, invoking the doctrine of primary jurisdiction. *See Advamtel, LLC v. Sprint Communications Co.,* 125 F.Supp.2d 800 (E.D.Va.2001). The two questions were: (1) whether any statutory or regulatory constraints prevent an IXC from terminating or declining access services ordered or constructively ordered; and (2) if not, what steps IXCs must take to avoid ordering service or to cancel service after it has been ordered. *Id.* at 807. The district court said that if the FCC did not act within six months, the court would proceed to trial and resolve the issues itself. *Id.*

When the FCC failed to act within the allotted time, the district court decided to reach the issues itself and ordered the parties to submit briefs on the issues. The court then held that the "plain terms of § 201(a)" of the Communications Act do not "impose on AT&T any duty to accept all access services." *See* Transcript of Motions Hearing Before Judge Ellis in *Advamtel, LLC v. AT&T Corp.,* No. 00–643–A, at 18, *reprinted in* Joint Appendix at 342. Under § 201(a), the FCC may order, on a prospective basis after opportunity for a hearing, an IXC to provide service to end users and to establish connections with other carriers. *Id.* Because the FCC had not held a hearing or issued a prospective order, the district court entered partial summary judgment for AT&T on the issue whether the FCC could compel AT&T to purchase the access services in dispute, and it set the remaining issues for trial. *See* Order in *Advamtel,*

*LLC v. AT&T Corp.,* No. 00–643–A (E.D. Va. Sept. 7, 2001), *reprinted in* Joint Appendix at 359–61.

Just weeks after the district court issued its order, the FCC finally acted on the questions referred to it by the district court. *See Declaratory Ruling,* 16 F.C.C.R. at 19158. The FCC's ruling declared that "an IXC cannot refuse to exchange originating or terminating [access] traffic with the CLEC." *Id.* at 19163. The FCC based its reasoning on the first clause in § 201(a) of the Federal Communications Act, which requires common carriers to accept a "reasonable request" for service. *See* 47 U.S.C. § 201(a). According to the FCC, during the period at issue, CLECs were required to file tariffs and such filed tariffs were considered presumptively lawful. *See Declaratory Ruling,* 16 F.C.C.R. at 19163. Therefore, IXCs must accept all requests "to complete a call using CLEC access service that is tariffed at presumptively reasonable rates." *Id.* at 19163–64.

AT&T filed a timely petition for review of the FCC's declaratory ruling, bringing the case before us. Because the FCC's interpretation of a statutory provision it administers is at issue, we now review the FCC's declaratory ruling in accordance with *Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

## II.

■ The question before us is whether § 201(a) permitted AT&T to refuse to purchase access services from a CLEC when an end user has requested that AT&T provide longdistance service through the CLEC. Section 201(a) provides:

It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon

reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

47 U.S.C. § 201(a). The first clause of § 201(a)—the clause preceding the semicolon—establishes the duty of every common carrier to furnish communication service upon "reasonable request." The second clause—after the semicolon—provides that the FCC may order a carrier to establish a through route only after opportunity for a hearing.

AT&T argues that when both clauses of § 201(a) are considered together, it is clear that the first clause of § 201(a) concerns a carrier's obligations to its own customers' reasonable requests and that the second clause concerns a carrier's obligation to provide service in conjunction with other carriers. See Brief of Petitioner at 16. This, according to AT&T, means that it must provide service to customers upon "reasonable request" only when doing so would not compel AT&T to act jointly with other carriers. See id. When providing service would require AT&T to establish a physical connection or through route with another carrier, then AT&T asserts that its duty to purchase access services from a CLEC is limited to obeying any FCC order entered after the hearing provided in the second clause of § 201(a). See id. As against this, the FCC argues that when a customer makes a "reasonable request" for service, IXCs are required by the first clause of § 201(a) to provide the service—whether or not providing that service would force the IXC to act in conjunction with other carriers

without the hearing called for in the second clause of § 201(a).

We reject the FCC's interpretation. The language of § 201(a) is clear: if the FCC wants to compel AT&T to establish a through route with another carrier, then the FCC must follow the procedures specified in the second clause of § 201(a). In ruling that AT&T was obligated to purchase access services from CLECs, the FCC sought—without first having followed the procedures specified in the second clause of § 201(a)—to compel AT&T to establish a through route.

■ It cannot be that a CLEC's demand to an IXC for a physical connection or a through route is a request by the CLEC's customer for such service under the first clause of § 201(a). This would allow the first clause in § 201(a) to render the second clause meaningless. Yet all parts of a statute are to be given effect, see *Weinberger v. Hynson, Westcott & Dunning*, 412 U.S. 609, 633, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973), as the FCC recognized long ago in regard to § 201(a). See *American Tel. & Tel. Co. & the Western Union Tel. Co.*, 5 Rad. Reg.(P & F) 639, 659 (1949) (explaining that if a customer could effect the establishment of a through route, this "would permit the customer to do at will what this Commission cannot do without a finding, after opportunity for a hearing, that such action is 'necessary or desirable in the public interest,' and would result in a clear circumvention of the Congressional intent expressed in § 201(a) of the Act.").

The FCC gave the second clause of § 201(a) no more than one cursory paragraph's worth of attention in its declaratory ruling. See *Declaratory Ruling*, 16 F.C.C.R. at 19164–65. On appeal the FCC offers three newly-discovered reasons why the second clause does not change its analysis. First, the FCC argues that AT&T

voluntarily connected with the CLECs and thus there was no need for the FCC to decide whether AT&T had a duty to connect under the second clause of § 201(a). *See* Brief for Respondents at 27. Second, the FCC asserts that the *Specialized Common Carrier* rulemaking proceeding requires LECs and IXCs to interconnect their networks. *See id.* at 28 (citing *Specialized Common Carrier,* 29 F.C.C.2d 870 (1971)). Third, the FCC claims that § 251(a)(1) of the Act, which requires telecommunications carriers to interconnect with the facilities and equipment of other carriers, imposes an interconnection duty on AT&T. *See* Brief for Respondents at 31 (citing 47 U.S.C. § 251(a)(1)). None of these three assertions were relied upon—or for that matter even discussed—in the FCC's declaratory ruling, and we therefore will not consider them. *See SEC v. Chenery,* 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

The petition for review is granted. The declaratory ruling of the FCC is vacated.

*So ordered.*